**In re John M. THOMA, Judge, County Court at Law No. 1, Galveston County, Texas, Respondent.**

No. 62.

Review Tribunal,
Appointed by
Supreme Court of Texas.

March 15, 1994.

---

478

M. Bruce Fort, Texas City, Gerald A. Burks, Galveston, for respondent.

Robert Flowers, Executive Director, State Com'n on Judicial Conduct, Austin, William E. Hornung, Examiner, Com'n on Judicial Conduct, Austin, for the Com'n.

## OPINION

BARAJAS, Chief Justice, delivered the opinion of the Review Tribunal, in which BOYD, Presiding Justice, BROOKSHIRE, FARRIS, SMITH, LEE and HOLCOMB, Justices, join.[1]

This action results from the recommendation by the State Commission on Judicial Conduct that Respondent, John N. Thoma, be removed as Judge of the County Court at Law No. One of Galveston County, Texas, and further, that he be prohibited from holding judicial office in the future.[2] Respondent has rejected the findings, conclusions, and recommendations of the Commission, and in 28 points of error, challenges the findings and ultimate recommendation that he be removed from office. We affirm the Commission's recommendation.

## I. SUMMARY OF THE EVIDENCE

The comprehensive record in the instant case reflects that the State Commission on Judicial Conduct adopted the findings of fact which were entered by a Special Master. The Special Master found that Respondent engaged in willful or persistent conduct that is clearly inconsistent with the proper performance of his duties, in violation of TEX. CONST. art. V, § 1–a(6)A (1993), and further,

---

1. The Review Tribunal was composed of Justice John T. Boyd, Seventh District Court of Appeals, Amarillo, designated Presiding Justice; Chief Justice Richard Barajas, Eighth District Court of Appeals, El Paso; Justice Jack Brookshire, Ninth District Court of Appeals, Beaumont; Justice David Farris, Second District Court of Appeals, Fort Worth; Justice Bea Ann Smith, Third District Court of Appeals, Austin; Justice Norman Lee, Fourteenth District Court of Appeals, Houston; and Justice Charles Holcomb, Twelfth District Court of Appeals, Tyler.

2. This proceeding was initiated by the State Commission on Judicial Conduct on December 13, 1993, with its filing of the written request for appointment of the Review Tribunal. The action was brought in accordance with TEX. CONST. art. V, § 1–a (1993) and the RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 Tex.B.J. 823 (1993), promulgated by the Texas Supreme Court on May 22, 1992.

that Respondent willfully violated various provisions of the Texas Code of Judicial Conduct. *See* TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Amended to April 1, 1988, *reprinted at* TEX.GOV'T CODE ANN., title 2, Subt. G, Appendix B (Vernon 1988). Specifically, the Special Master found that Respondent entered into a conspiracy to extort money from a party in an action over which he exercised judicial authority. The Special Master further found that Respondent engaged in *ex parte* communications with criminal defendants relating to their then-pending criminal proceedings to waive fees, fines, court costs, and attorney's fees, and conducted *ex parte* proceedings in making a misleading docket entry, in granting a criminal defendant's application for restricted driver's license, in granting a criminal defendant a new trial, in reducing criminal defendants' sentences and terminating their probation, in waiving requirements of class attendance for D.W.I. defendants, in granting criminal defendants credit for "jail time served" in excess of time actually served, and in waiving and/or reducing fees, fines, and court costs and attorney's fees for criminal defendants. The above findings and the supporting evidence will be detailed in the discussion of each of Respondent's points of error.

## II. *PROCEDURAL HISTORY*

As this is the first formal removal proceeding instituted under TEX. CONST. art. V, § 1–a, discussion of the procedural aspects of the process is essential to a full and complete understanding of the action below.

Generally, a complaint is received in writing alleging misconduct on the part of a Texas jurist. Alternatively, a complaint may be initiated on the Commission's own motion.

RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 Tex.B.J. 823 (1993), Rule 3. An evaluation and/or preliminary investigation is conducted to determine whether the complaint is within the jurisdiction of the Commission and is of potential merit. *Id.*, Rule 3. If found to be within the Commission's jurisdiction and to be of merit, a full investigation is commenced with notice being given to the judge. *Id.*, Rule 4. A response from the judge is requested. *Id.*, Rule 4(c). Subsequent to a full investigation, a decision is made to place the matter on the Commission's regular agenda. Materials are prepared for the Commission and the matter presented for its consideration at an informal hearing at which time the judge may be afforded an opportunity to make an appearance. *Id.*, Rule 6(a). The Commission, after considering all materials presented, including comments from the judge under review if such comments have been requested and received, renders its decision to dismiss the complaint, issue an appropriate informal sanction,[3] or institute formal proceedings. If informal sanctions are imposed, the judge and the complainant are notified. The judge may request review of the informal sanction by a special court of review.[4] RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, Rule 9(a).

In the alternative, the Commission may institute formal proceedings in which case notice of formal proceedings are served on the judge in question. *Id.*, Rule 10(a). A verified answer is due by the judge to the Commission within 15 days from the date of service. *Id.*, Rule 10(b). The Commission sets a time and place for its formal hearing, giving notice to the judge and the Texas

---

3. The sanction may include a public or private admonition, warning or reprimand, or impose the requirement of additional training or education. TEX. CONST. art. V, § 1–a(8) (1993).

4. If review of the imposition of an informal sanction is requested, a written request for appointment of a special court of review is filed with the Chief Justice of the Texas Supreme Court within 30 days of the imposition of the informal sanction. RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 Tex.B.J. 823 (1993), Rule 9(a). The Chief Justice selects by lot a special court of review composed of three court of appeals jus-

tices, within 10 days of the request. *Id.*, Rule 1(g). The Commission is required to file its charging document within 15 days of the selection of the court. *Id.*, Rule 9(b). Trial is *de novo*, to be held within 30 days after the charging instrument has been filed. *Id.*, Rule 9(b) & (c); TEX.GOV'T CODE ANN. § 33.034(e) (Vernon Supp. 1993); *see also In re Sheppard*, 815 S.W.2d 917, 918 (Special Court of Review, 1991). The special court of review, in its discretion, shall render its non-appealable decision within 60 days from the date of its *de novo* review. TEX.GOV'T CODE ANN. § 33.034(h).

Supreme Court at least 20 days prior to the scheduled date of the formal hearing. *Id.,* Rule 10(c)(1). The Commission may direct that the formal hearing be before it or before a special master. *Id.,* Rule 10(c)(1). If the Commission directs that the hearing shall be before a special master, it shall make a written request to the Supreme Court to appoint such a special master. *Id.,* Rule 10(c)(2). The Supreme Court is to appoint a special master within 10 days from such a request. *Id.,* Rule 10(c)(2). If a formal hearing is conducted before a special master, the master is to furnish the Commission and the judge its findings and recommendation. *Id.,* Rule 10(h)(1). Objections, if any, to the report of the special master are due within 15 days with additional hearings, if any, to be held on 10 days' notice. RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, Rule 10(i) and (j). Subsequent to the conclusion of all hearings, the Commission renders its decision to dismiss the complaint, publicly censure the judge, or recommend the removal or the retirement of the judge. *Id.,* Rule 10(m). Upon making a determination to recommend the removal or retirement of a judge, the Commission is to request the Chief Justice of The Texas Supreme Court to appoint a review tribunal, composed of seven justices, selected by lot from the courts of appeals of our state. *Id.,* Rules 1(h); 11; 12(a). Within 90 days from the date the record is filed with the review tribunal, it shall order public censure, retirement, or removal, as it finds just and proper, or wholly reject the recommendation. *Id.,* Rule 12(h). A judge may appeal a decision of the review tribunal to the Texas Supreme Court under the substantial evidence rule. *Id.,* Rule 13.

The record in the instant case establishes that on October 6, 1992, Respondent was notified in writing that an investigation was being commenced regarding his alleged acts of judicial misconduct. On November 6, 1992, an informal hearing was conducted at which time Respondent testified in his own behalf. On December 16, 1992, Notice of Formal Proceedings was served on the judge. On January 12, 1993, upon request of the Commission, the Texas Supreme Court appointed the Honorable Oliver S. Kitzman, Senior District Judge, as Special Master to hear evidence on the charges and report thereon to the Commission. Following discovery and additional investigation, the judge was served with the Commission's First Amended Notice of Formal Proceedings which alleged wrongdoing in 14 additional cases then pending before the judge. On June 1–4, 1993, a formal hearing on the merits was conducted before the Special Master at the Galveston County Courthouse, Galveston, Texas. On January 13, 1976, the Special Master filed his findings with the Commission in which he concluded that a preponderance of the evidence showed Respondent to have engaged in judicial misconduct, as alleged in the Commission's First Amended Notice of Formal Proceedings. On December 17, 1993, the Commission agreed with and affirmed the Special Master's findings of fact. Thereafter, on December 17, 1993, the State Commission on Judicial Conduct filed its findings and conclusions with this Review Tribunal seeking review of its recommendation that Respondent be removed from office, and further, that he be prohibited from holding judicial office in the future.

### III. *DISCUSSION*

#### A. Burden of Proof Before Special Master

In *In re Brown,* the Supreme Court of Texas held that judicial disciplinary proceedings are not criminal proceedings, since the function of the Judicial Qualifications Commission, the predecessor of the current State Commission on Judicial Conduct, is not to punish but to maintain the high quality of the judiciary. *In re Brown,* 512 S.W.2d 317, 319 (Tex.1974), *citing In re Laughlin,* 153 Tex. 183, 265 S.W.2d 805 (1954); *McDaniel v. State,* 9 S.W.2d 478 (Tex.Civ.App.—Texarkana 1928, writ ref'd). While the Texas Code of Judicial Conduct and the Rules for the Removal or Retirement of Judges have both undergone numerous changes since *Brown,* we nonetheless adhere to the above holding and reaffirm the principle that judicial conduct proceedings are not criminal in nature, not simply because their purpose is not necessarily to punish, but also to maintain the honor and dignity of the

judiciary and to uphold the administration of justice for the benefit of the citizens of Texas. *See generally In re Brown*, 512 S.W.2d at 319; *In re Coruzzi*, 95 N.J. 557, 472 A.2d 546 (N.J.1984), *appeal dismissed*, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 8 (1984); *In re Diener*, 268 Md. 659, 304 A.2d 587 (Md.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); *Sharpe v. State*, 448 P.2d 301 (Okla.Jud.Ct.1968), *cert. denied*, 394 U.S. 904, 89 S.Ct. 1011, 22 L.Ed.2d 216 (1969). In that regard, the burden was upon the Examiner for the Texas Commission on Judicial Conduct to establish, before the Special Master, the allegations against Respondent by a preponderance of the evidence. *In re Brown*, 512 S.W.2d at 319–20; *see also In re King*, 409 Mass. 590, 568 N.E.2d 588 (1991); *In re Littleton*, 719 S.W.2d 772, 775 (Mo.1986); *In re Lowther*, 611 S.W.2d 1, 2 (Mo.1981); *Geiler v. Comm'n on Judicial Qualifications*, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974).

### B. Standard of Review on Appeal

■ The procedures established for the initial adjudication of the instant case, i.e., formal proceedings before a special master or the Commission, are to be conducted as nearly as practicable in accordance with established rules of civil procedure. RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, 56 Tex.B.J. 823 (1993), Rule 10(d). Moreover, during the course of any hearing conducted in the furtherance of formal proceedings, whether before a special master or the Commission, only legal evidence is to be received. *Id.*, Rule 10(e). Absent a statement of objections to the report of the special master, the Commission may adopt the findings of the special master as its own. *Id.*, Rule 10(j). Consequently, in reviewing the instant case, we hold the findings of the Special Master, as adopted by the Commission, to be tantamount to findings of fact filed by a trial judge in a trial without a jury, and as a result, are reviewable as such.

■ The extensive record in the instant case includes a statement of facts. Consequently, the Commission's adopted findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards applied in reviewing the legal and factual sufficiency of the evidence supporting findings in a civil case, either by a trial court or by a jury. *See Cullen Ctr. Bank & Trust v. Texas Commerce Bank*, 841 S.W.2d 116, 121 (Tex. App.—Houston [14th Dist.] 1992, writ denied); *Green Tree Acceptance, Inc. v. Holmes*, 803 S.W.2d 458, 461 (Tex.App.—Fort Worth 1991, writ denied); *First Nat'l Bank v. Kinabrew*, 589 S.W.2d 137, 146 (Tex. Civ.App.—Tyler 1979, writ ref'd n.r.e.).

■ A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See generally In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 836 (Tex.App.—Amarillo 1993, writ denied); *Davis v. McQueen*, 842 S.W.2d 376, 385 (Tex.App.—Beaumont 1992, writ denied). As in civil appeals, this Review Tribunal cannot substitute its findings for those of the Commission. If there is sufficient competent evidence of probative force to support the findings and recommendation, they must be sustained. *See Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied). It is not within the province of this Tribunal to interfere with the Commission's resolution of conflicts in the evidence or to pass on the weight or credibility of the witnesses' testimony. *See Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951). Where there is conflicting evidence, the findings of the Commission on such matters will be regarded as conclusive. *See Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947); *Oechsner*, 840 S.W.2d at 136.

■ In considering a "no evidence" legal insufficiency point, we consider only the evidence that tends to support the Commission's findings and disregard all evidence and inferences to the contrary. *See Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence"

point fails. *Worsham Steel Co. v. Arias*, 831 S.W.2d 81 (Tex.App.—El Paso 1992, no writ).

## C. Issues Presented

### 1. Admissibility of Audio Tapes and Corresponding Transcripts

In Points of Error Nos. One and Two, Respondent asserts that the Special Master abused his discretion in admitting various tape recordings in evidence, as well as written excerpts of portions of those tape recordings.

The evidence in the instant case shows that in late October and early November of 1991, Officer Joe Haralson of the Texas Rangers received information that Respondent had agreed to take money in exchange for some leniency or dismissal in sentencing in a case involving a D.W.I. probation. This information was provided by Hollis Mathews, the probationer in that case.[5] After receiving this information, Officer Haralson met with Mathews and initiated an investigation of these allegations. After his preliminary inquiries, Officer Haralson concluded that the matter warranted further investigation and contacted Investigator Felix Mares of the Galveston County District Attorney's Office. From there, the investigation into the alleged misconduct of Respondent became a joint effort between Officer Haralson and Investigator Mares.

The evidence in the instant case shows that the audio cassette tapes which were introduced into evidence were "duplicates" from a reel-to-reel recorder properly identified as a Nagra SNS. This Nagra SNS recorder is a portable tape recording device that was used in the investigation by Officer Haralson and Investigator Mares to record the meetings and conversations between Mathews and Respondent. The recorder was concealed from Respondent by placing it on the body of Mathews during these meetings. A "back-up" to the Nagra SNS was also used, that "back-up" being a one-way body transmitter whose signal was to be recorded by a listener using a second tape recorder. Copies of the Nagra SNS reel-to-reel tapes, in cassette form, were made by Felix Mares, Chief Investigator, Galveston County Criminal District Attorney's Office and were offered as "duplicates" of the original reel-to-reel tapes pursuant to Tex.R.Civ. Evid. 1003. Respondent made no objection to the admission of the audio cassette tapes into evidence as "duplicates," but rather, limited any objection to the authenticity of the tapes. The Special Master admitted the "duplicates" of the audio tapes over Respondent's objections. The original recordings made from the aid transmitter, i.e., the one-way body transmitter, were neither offered nor admitted in evidence.

Respondent, on review by this Tribunal, contends that a proper predicate for the admission of the above tapes was not laid in that proper identification of the individuals whose voices were recorded was not specifically made[6] and that there is no evidence that the operator of the tape recorder was competent to operate such a device.

In *Seymour v. Gillespie*, the Texas Supreme Court adopted the seven-prong approach to the admissibility of audio recordings. In order for a tape recording to be admissible, the offeror must show or establish:

(1) that the recording device was capable of taking testimony;

(2) that the operator of the device was competent;

(3) the authenticity of the correctness of the recording;

---

5. The record in the instant case shows that as of November 12, 1991, the date of the first recorded conversation between Mathews and Respondent, Mathews was on probation for the offense of driving while intoxicated in Cause No. 120568 in Respondent's court. An information was subsequently filed against Mathews by the Criminal District Attorney of Galveston County on December 26, 1991 for the offense of terroristic threat, designated as Cause No. 124702, in the same court. Another information was also filed on December 26, 1991 in the same court for the offense of criminal mischief, designated as Cause No. 124678. Both of these subsequent offenses were allegedly committed on October 20, 1991.

6. The record shows that although Investigator Mares described the voices on the tape recordings and did state which individual was on each tape, he failed to specifically identify each individual and their respective conversations.

(4) that changes, additions, or deletions have not been made;

(5) the manner of the preservation of the recording;

(6) the identification of the speakers; and

(7) that the testimony elicited was voluntarily made without any kind of inducement.

*Seymour v. Gillespie,* 608 S.W.2d 897, 898 (Tex.1980); *see also Cummings v. Jess Edwards, Inc.,* 445 S.W.2d 767 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.); *Interest of T.L.H.,* 630 S.W.2d 441, 447 (Tex.Civ.App.—Corpus Christi 1982, writ dism'd w.o.j.). Moreover, the trial court may infer some of the above elements, and therefore, the proponent need not establish each of them in detail. *Seymour v. Gillespie,* 608 S.W.2d at 897; *see also Edwards v. State,* 551 S.W.2d 731 (Tex.Crim.App.1977). When a proper predicate is laid and there are no fundamental problems, the trial court can, in its discretion, admit tape recordings into evidence. *See In re Bates,* 555 S.W.2d 420, 423 (Tex.1977); *Drake v. State,* 488 S.W.2d 534, 538 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.).

The record in the instant case shows that, at the hearing before the Special Master, the Examiner attempted to lay the predicate for the admission of the cassette tapes into evidence through the testimony of Chief Investigator Mares. Investigator Mares described the Nagra SNS recorder and the number of times it had been used and rated its quality for recording sound as "very good." Investigator Mares also testified that he was competent and knew how to operate the device and that Hollis Mathews was also competent to operate the recorder. Investigator Mares further testified that he had listened to the recordings and that they had fine quality

sound and appeared to be correct and authentic recordings.

As to the preservation of the recordings, the record shows that Investigator Mares testified that there are no indications that the recordings had been tampered with or altered, that there was no reasonable opportunity for others to tamper with them, and that the recordings had been in his office since the time he took possession of them from Hollis Mathews. Finally, Investigator Mares testified that he could personally identify the speakers on the tapes and he described characteristics of the voices and how each might be distinguished; he further testified that the statements on the recordings were made voluntarily.

We find the above testimony of Investigator Mares sufficient to establish the admissibility into evidence of the duplicate audio cassette tapes to the same extent as the original Nagra SNS recordings. *See* TEX. R.CIV.EVID. 1003. Additionally, in considering Respondent's assertion that there is "no evidence" that the operator of the tape recorder was competent to operate such a device, we have considered only the evidence tending to support the Commission's findings and have disregarded all evidence and inferences to the contrary, and conclude that there is more than a scintilla of evidence to support the questioned finding. Respondent's "no evidence" point fails, and Point of Error No. One is overruled in its entirety.

In Point of Error No. Two, Respondent complains of the admission into evidence of the written excerpts from the audio tapes. The general rule is that a transcript made from a recording or re-recording is obviously not an "original," and because it is the product of human agency it is not a "duplicate," as those terms are defined in Rules 1001(3) and (4) of the Texas Rules of Civil Evidence.[7] Consequently, we hold the

7. Rules 1001, 1002, and 1003 read in pertinent part as follows:

RULE 1001. DEFINITIONS

(3) Original. An "original" of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it....
(4) Duplicate. A "duplicate" is a counterpart produced by the same impression as the

original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording ... which accurately reproduce the original.

RULE 1002. REQUIREMENT OF ORIGINALS

To prove the content of a writing, recording, or photograph, the original writing, recording,

Special Master erred in admitting the written excerpts, having previously admitted the audio tapes themselves.

However, we find the error in admitting the written excerpts of the recordings into evidence to be harmless. *See* TEX.R.APP.P. 81(b). The record in the instant case clearly shows that the Special Master listened to the entirety of each of the audio tapes previously admitted into evidence, paying special attention to context and audibility. The substance of the written excerpts is completely contained in the audio tapes themselves; therefore, the written excerpts are merely cumulative of the evidence previously considered by the Special Master. Accordingly, Respondent's Point of Error No. Two is overruled.

### 2. Definition of "Willful" Misconduct

■ In Point of Error No. Five, Respondent contends that the Commission improperly interpreted the term *willful* in its findings of fact and conclusions. Specifically, Respondent maintains that the Commission interpreted the definition of willfulness in its broadest terms, finding that Respondent's actions were willful in that he intentionally engaged in such actions.[8] Respondent argues that a judge can be sanctioned only when the actions are done in bad faith or the

equivalent, not when they are merely intentional.

We note at the outset that Respondent does not challenge as unconstitutionally vague the phrase "willful or persistent conduct that is clearly inconsistent with the proper performance of his duties." TEX. CONST. art. V, § 1–a(6)A. Rather, Respondent simply suggests that a mere finding of "willful" is insufficient, absent a finding of "bad faith," and by implication, asserts that the evidence is legally and factually insufficient to support a finding of willful misconduct. As noted earlier, this proceeding was initiated pursuant to TEX. CONST. art. V, § 1–a. Section 1–a(6) reads in part as follows:

(6)A. Any Justice or Judge of the courts established by this Constitution or created by the Legislature as provided in Section 1, Article V, of this Constitution, may, subject to the other provisions hereof, be removed from office for willful or persistent violation of rules promulgated by the Supreme Court of Texas, incompetence in performing the duties of the office, willful violation of the Code of Judicial Conduct, or **willful or persistent conduct that is clearly inconsistent with the proper performance of his duties** or casts

---

or photograph is required except as otherwise provided in these rules or by law.
RULE 1003. ADMISSIBILITY OF DUPLICATES
A duplicate is admissible to the same extent as an original unless (1) a question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

**8.** In Point of Error No. Five, Respondent has limited his assertion that the Commission interpreted the definition of willfulness in its broadest terms to the application of TEX. CONST. art. V, § 1–a(6)A. Specifically, Respondent challenges the definition of "willfulness" as applied to the following findings:
Item 1, Charge 5
Judge Thoma's willful, ex parte conversations relating to the criminal proceedings over which he had judicial authority and involving Hollis Mathews on 11/12/91, 01/09/92, 01/17/92, 01/28/92, 03/06/92, and 03/21/92 constituted persistent conduct clearly inconsistent with the proper performance of his duties in violation of the Texas Constitution Article V, Section 1–a(6)A as charged in Item 1, Charge 11.

Item 1, Charge 6
Judge Thoma's actions between 07/10/91 and 03/16/92 of conspiring with Danny Mendez to extort money from Hollis Mathews constituted willful conduct clearly inconsistent with the proper performance of his duties in violation of the Texas Constitution Article V, Section 1–a(6)A as charged in Item 1, Charge 12.
Item 2, Charge 5
That Judge Thoma's willful, ex parte actions on 02/13/89, 04/11/89, 09/05/89 and 10/06/89 of entering orders on an ex parte basis in favor of criminal defendant Danny Mendez in Cause No. 100758 constituted persistent conduct clearly inconsistent with the proper performance of the judge's duties in violation of the Texas Constitution Article V, Section 1–a(6)A as charged in Item 2, Charge 5.
Item 16, Sole Charge
That Judge Thoma's willful action of granting the defendant Jose Anthony Romero credit for "jail time served" in excess of time actually served constituted willful conduct clearly inconsistent with the proper performance of his duties in violation of the Texas Constitution, Article V, Section 1–a(6)A as charged in the only charge under Item 16.

public discredit upon the judiciary or administration of justice.... [Emphasis added].

Although Texas courts have previously decided cases using the "willful" standard provided by Article V, § 1–a of the Constitution, they have never specifically defined the term "willful" misconduct. *In re Davila,* 631 S.W.2d 723, 726 (Tex.1982) (twenty-six acts of nepotism and leaving the scene of an accident constitutes willful misconduct); *In re Carrillo,* 542 S.W.2d 105, 111 (Tex.1976) (misuse of funds by judge constitutes willful misconduct); *In re Brown,* 512 S.W.2d at 317, 324 (judge willfully committed misconduct by authorizing electronic eavesdropping of an accused defendant and his attorney, but the judge did not engage in willful misconduct by being excessively absent, too readily finding persons in contempt of court, lecturing the county and district attorneys concerning the conduct of their offices, and conducting hearings in the absence of the accused person's counsel).

■ It is well established that a reasonable construction should be given constitutional provisions, and a provision will not be construed so as to lead to absurd conclusions, great public inconvenience or unjust discrimination, if any other interpretation can be reasonably indulged. *Railroad Comm'n v. St. Louis Southwestern Ry. Co.,* 443 S.W.2d 71, 74 (Tex.Civ.App.—Austin 1969, writ ref'd n.r.e.) *citing Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147 (1942). Furthermore, when the meaning of a written law is doubtful, it should have that construction that seems best calculated to promote the public interest, upon the theory that its framers so intended. *State v. De Gress,* 72 Tex. 242, 11 S.W. 1029, 1030 (1888). It is within these

confines that we determine the definition of the term "willful," as applied to the facts of the instant case.

Respondent, relying on authorities from other jurisdictions, contends that a judge can be sanctioned for acting willfully only when it is shown that the judge has acted in bad faith or the equivalence thereof.[9] *In re Sheffield,* 465 So.2d 350, 357 (Ala.1984); *In re Haddad,* 128 Ariz. 490, 627 P.2d 221, 228 (1981); *Gubler v. Comm'n on Judicial Performance,* 37 Cal.3d 27, 207 Cal.Rptr. 171, 182, 688 P.2d 551, 562 (1984); *Wenger v. Comm'n on Judicial Performance,* 29 Cal.3d 615, 175 Cal. Rptr. 420, 630 P.2d 954, 957, n. 4 (1981); *Spruance v. Comm'n on Judicial Qualifications,* 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209, 1221 (1975); *Nicholson v. Judicial Retirement and Removal Comm'n,* 562 S.W.2d 306, 310 (Ky.1978); *In re Inquiry Concerning Garner,* 466 So.2d 884 (Miss. 1985); *In re Kelly,* 225 Neb. 583, 407 N.W.2d 182, 185–86 (1987); *In re Nowell,* 293 N.C. 235, 237 S.E.2d 246, 255 (1977); *In re Edens,* 290 N.C. 299, 226 S.E.2d 5, 9 (1976); *In re Complaint of Gustafson,* 305 Or. 655, 756 P.2d 21, 24 (Or.1988). We agree with Respondent to the extent that the term "willful," as applied in TEX. CONST. art. V, § 1–a(6)A, requires a showing, but not necessarily a finding, of bad faith. *See In re Kelly,* 407 N.W.2d at 182. Moreover, we specifically hold that the term "willful," as applied in TEX. CONST. art. V, § 1–a(6)A, is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross indifference to his conduct. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude,

9. We note that the Arizona and California Supreme Courts have described willful misconduct as "unjudicial conduct which a judge acting in his judicial capacity commits in bad faith...." *In re Haddad,* 128 Ariz. 490, 497–98, 627 P.2d 221, 228–29 (1981); *Geiler v. Comm'n on Judicial Qualifications,* 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973). California further requires willful misconduct to be conduct that a judge, in a judicial capacity, committed in bad faith; i.e., that the judge (1) committed acts he knew or should have known to be beyond his power; and, (2) for a purpose other than faithful discharge of judicial duties. *Geiler,* 10 Cal.3d at

283–84, 286, 110 Cal.Rptr. 201, 515 P.2d 1; *Spruance v. Comm'n on Judicial Qualifications,* 13 Cal.3d 778, 795–96, 119 Cal.Rptr. 841, 532 P.2d 1209 (1975). The North Carolina and Mississippi Supreme Courts define the charge as follows: " '[w]illful misconduct in office is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence....' " *In re Inquiry Concerning Garner,* 466 So.2d 884, 885 (Miss.1985) (quoting *In re Nowell,* 293 N.C. 235, 237 S.E.2d 246 (1977)).

dishonesty, corruption, misuse of office, or bad faith generally, whatever the motive. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority may in and of itself constitute bad faith. *See generally In re Nowell*, 293 N.C. 235, 237 S.E.2d 246, 255 (1977); *In re Edens*, 226 S.E.2d at 5, 9; *Spruance*, 119 Cal.Rptr. at 841, 843, 532 P.2d at 1209, 1221; *Geiler v. Comm'n on Judicial Qualifications*, 110 Cal. Rptr. at 211, 515 P.2d at 11; *In re Haggerty*, 257 La. 1, 39, 241 So.2d 469, 478 (1970).

We now apply the above definition of willful in considering Respondent's remaining points of error asserting by implication that the evidence is insufficient to support the Commission's finding of willful or persistent conduct that is clearly inconsistent with the proper performance of Respondent's duties.

### 3. Conspiracy to Extort

In Point of Error No. Twenty-eight, Respondent contends that the Commission erred in concluding that he conspired with Danny Mendez to extort money from Hollis Mathews. Specifically, Respondent maintains that the Special Master's Findings of Fact on Specific Allegations contain no finding on conspiracy and further, that there is no evidence of any such conspiracy. We disagree.

The Commission, in its findings, conclusions, and recommendations, concluded that Respondent's actions between July 10, 1991 and March 16, 1992 in conspiring with Danny Mendez to extort money from Hollis Mathews constituted willful conduct clearly inconsistent with the proper performance of his duties in violation of TEX. CONST. art. V, § 1–a(6), as charged in Item 1—Charge 12.[10] The above conclusions by the Commission

are premised on the Special Master's Findings of Fact on Culpability, entered on August 19, 1993, in which the Special Master specifically found as follows:

d. Between July 10, 1991 and March 16, 1992, Respondent conspired with Danny Mendez to extort money from Hollis Mathews.

Consequently, we hold that contrary to Respondent's assertions, the record in the instant case does indeed reflect that the Special Master made a specific finding on the conspiracy charge.

 Respondent next asserts that there is no evidence of any such conspiracy. As noted, the Commission's First Amended Notice of Formal Proceedings alleged that Respondent entered into a conspiracy with Danny Mendez to extort money from Hollis Mathews. An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983), *citing Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex.1964) and *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550, 559 (1937). The essential elements are:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of minds on the object or course of action;

(4) one or more unlawful, overt acts; and

(5) damages as the proximate result.

*Massey*, 652 S.W.2d at 934; *see also Central Sav. & Loan Ass'n v. Stemmons Northwest Bank, N.A.*, 848 S.W.2d 232 (Tex.App.—Dallas 1992, no writ). The gist of a civil conspiracy is the damage resulting from the commission of a wrong that injures another and not the conspiracy itself. *Schlumberger Well*

---

10. Item 1—Charge 12 of the First Amended Notice of Formal Proceedings, stated as follows:
 Your agreement with Danny Mendez, entered into between July 10, 1991 and March 6, 1992, to extort money from Hollis Mathews and your action on March 6, 1992 of unlawfully waiving the fines, fees and costs in Cause No. 120568 constituted willful conduct clearly inconsistent with the proper performance of your duties in violation of The Texas Constitu-

tion, Article V, Section 1–a(6)A which provides, in pertinent part, that "Any justice or judge of the court established by this Constitution or created by the legislature as provided in Section 1, Article V of this Constitution, may, subject to the other provisions hereof, be removed from office ... for willful ... conduct that is clearly inconsistent with the proper performance of his duties...."

*Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968). Thus, proof of intent to participate in a conspiracy is a necessary factor of the "meeting of the minds" element. *Id.* at 857; *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206 (Tex.App.—Houston [14th Dist.] 1991, no writ).

The record in the instant case establishes that on January 9, 1992, a conversation took place in the stairwell of the Galveston County Courthouse between Hollis Mathews and Respondent in which the following was discussed:

Judge: What you got?

Mathews: I got this—

Judge: Is it from the probation department?

Mathews: Yeah.

Judge: Yeah, uh, Danny talked to me about this yesterday as a matter of fact, a few days ago.

Mathews: Well, he called me Sunday and I just got that Saturday—

Judge: Um-hm. We'll take care of this. I don't—what the—it should have been in the first place. Apparently what happened is that—you got—

Mathews: —?

Judge: Yeah, you got credit for all this and what happened is I'll bet—

Mathews: None of this has been paid.

Judge: Oh, yeah, that's what I'm saying is that this apparently what happened is that it was on the docket sheet but it didn't get transferred over to the, you know, judgment papers and that's what the probation department gets. This happens all the time where they get—they fill in the judgment and its different from what the [sic] actually occurs in the courtroom on the docket sheet. So what your, what's your phone number?

Mathews: 948–2841.

Judge: 2481.

Mathews: 2841.

Judge: 28—

Mathews: Danny called Sunday I don't know what he wanted I called him back Monday and he never did return my call—

Judge: Well, he talked to me about it, he figured something was going on.

Mathews: Where do my other $500 go, do I just give that to Danny, give it to you or what?

Judge: Well, I guess give that to Danny and then we'll take care of this. I mean, this will be taken care of today.

Mathews: Be taken care of today?

Judge: Yeah.

Mathews: I was getting worried about it.

Judge: Yeah, ignore that, they gotta come through me to do it. So don't worry about it. You see Danny, he figured something was going on that's why he called me on it. And uh and I'll pull it and send a copy of the docket sheet over to the probation department so they know that you're clear.

Mathews: What about the 27th? Do I still come up here on the 27th?

Judge: You won't need to come back on this at all, period. O.K.?

Mathews: O.K.

Judge: O.K. goodbye

The record further establishes that on January 17, 1992, a conversation took place at Efren's Paint & Body Shop, located in Texas City, Texas, among Respondent, Danny Mendez,[11] and Hollis Mathews in which the following was discussed:

11. The record shows that Daniel Mendez, a/k/a Danny Mendez, is a close personal friend of Respondent. On January 27, 1989, Mendez pleaded guilty to the misdemeanor offense of driving while intoxicated in Cause No. 100758 and was placed on probation for a period of 24 months. On February 13, 1989, Mendez' motion for new trial was granted, and the case reinstated on the court's docket. On April 10, 1989, the order granting new trial was vacated, and the original sentence as imposed on January 27, 1989 was reinstated. The record shows that on the following day, the requirement that Mendez attend a D.W.I. class was waived, he was given credit for 2 days served on his fine, and his driving privileges were ordered not suspended. On September 5, 1989, Mendez' fees were waived "for good cause shown," as reflected in the court's docket entry. Finally, on October 6, 1989, ten months into the period of probation, Respondent reduced Mendez' sentence and terminated his probation.

Judge: So, ah what we're going to do is I'm going to get old Dave Cook to file an early termination. O.K. now you're scheduled to come on what, next week or week after?

Mathews: The 28th but he said not to.

Judge: O.K. we're going to, we're going to work something to get you off probation. Let's get them dismissed get it taken off your record. I'm going to appoint, I'm going to get Cook to file a motion have a hearing to have what I don't think we'll do, because all Pacheco wanted to do was just get you to come in and say hey, here I am. You did that, made him feel, you know, fucked him all up so he feels real good so he's happy. We just had a big change of administrations at the D.A.'s office, makes a big, big difference. So probably next week outside two weeks you'll be dismissed, be off probation, be off your record. We gotta go in the back. Cause we got to help Efren. I got a case in the back.

. . . . .

Judge: I just—I just told Hollis, said hey look he was just like you know like hey man I got that son of a bitch come crawling to me. That's all he wanted to do.

Mathews: Now he called me.

Judge: Huh—

Mathews: He called me.

Judge: That's what I'm saying. He got to—you went in and talked with him—oh, shit—

Mathews: I just, uh—

Judge: You know he got to dump on you. You know made you feel like a shithead. That's all he wanted to do. So we're going to waive all fees we're going to dismiss the probation.

Mendez: How bout that, how bout that D.W.I. class we're taking?

Judge: He does not have to do that shit—

Mendez: He gave him a letter did you show it to him?

Mathews: No, not in here.

Mendez: Oh, O.K. See he was worrying about it, you know—

Mathews: I—I—

Mendez: Man I don't know what I—

Judge: So I'll take care of all that stuff—

Mathews: It's just all had me worried cause I been kinda in the dark I don't know what—

Judge: Oh, you know what they want to do is feel good you know to make sure that they got you under their thumb, he showed you that he could get you under thumb, their thumb, that's all he needs. So the probation department's taken care of. Now we get Cook to file a motion for early termination. O.K. We do that Tuesday cause Monday the courthouse is closed. Or whenever Cook shows up. We'll get him to file a motion and then they'll scream, holler and yell about it but—

Mendez: They don't wanta [sic] they can't go over you can they John?

Judge: No! absolutely not. That's my case. There's nothing that they can do to go over me. So you have nothing to worry about.

Mendez: See he won't have to go over to that D.W.I. class or nothing.

Judge: I'll waive that, so he's got no problem—

Mendez: He was worrying about it, I said Goddamn I said, you know, let me see what we can come up with—

Judge: We, uh—

Mendez: I don't understand—

Judge: —

Mendez: I understand, Goddamn, I ain't that—, man you know what I done, it was cold this morning and I was putting that goddamn—

Someone: I think you sure—Mexico, born in Mexico, you know—

Mendez: Hey this guy is good as blood man he just can't jump up I'm telling you he told you he's the man that's got all the power in the world. That fucking goddamn what-do-you-call-it—

Mathews: Probation officer?

Mendez: He ain't got dick over him. He says nope I'm waiving and that's it.

Mathews: I know Danny, still, if you's [sic] in my position you would be too.

Mendez: Yeah, I know yeah.

Mathews: You know, I got into this but, you know, I—not really knowing you and not knowing anybody really—

Mendez: Yeah, well we're not going to fuck you I promise you. I been, you know, your deal is straight, that's why I'm saying hey just come off with the money that makes me even look better, you know I'm just telling you my opinion. You know what I mean.

Mathews: We can take care of that tonight or in the morning—

Mendez: You're not going to get fucked—

Judge: I'm fixing to get you straight so you just—

Mathews: I just you know like I was telling you I don't you know until I come back from Vegas I didn't know Danny and I didn't know what was going on—

Judge: Danny's problem is that Danny doesn't know what the shit's—I mean he says all these things and he don't know what he's talking about and he gets people already committed and involved and—and he really doesn't know what he's doing so I mean he's a super guy, he's one of my best friends—

Mathews: Yeah—

Judge: But he's he just—you need to take him and kick his ass every once in a while—

Mathews: I just really got to the point, well now, her's—between all that sheetrock and stuff on his house and I already spent—I already gave him $500 and I got that other money coming in from my uncle, it's shit probably here now, I don't know.

Judge: Super guy, good guy but he just doesn't know what he's talking about a lot of the time anyway—your [sic] in good shape, guarantee it. What we, we'll do is you'll be getting a call from a guy. I got the phone number, the one you gave the 948 number. And ah, ah

I'm going to see next time—I see Cook Tuesday, I'll tell him that, you know, he's going to file a motion, you have to get the probation dismissed get it taken off the records for you.

Mathews: That call will be an answering machine I been trying to get some work over there at Missouri City and I haven't had no luck yet.

Judge: That's O.K. Just remember the name David Cook. David Cook. Man he's another crazy son of a bitch.

. . . . .

Mathews: Well that other, that something, that money will be here tonight or this evening, it's probably already here—

Mendez: Well, if it is, come by the house and I'll get it to you in the morning.

Judge: Whatever Danny, he tells you, blow it off, talk to me first. O.K.?

Mendez: Well I mean he's got to worry about, John, I understand the man he ain't got nobody to look to—

Judge: I guess so if he told me what was happening, shit I'd be worried about it too. Goddamn, I tell you shit man your nuts are going to jail man some big nigger going to be fucking you in the ass for the next two years—

Mathews: Now that's when they get me on the murder charge. Go out this door or that one?

Mendez: No, I saw—

Judge: Where you parked?

Mathews: Right there.

Judge: Go out that door—

. . . . .

Finally, the record in the instant case shows that on January 28, 1992, a private conversation took place in Respondent's chambers in the Galveston County Courthouse among Respondent, Danny Mendez, and Hollis Mathews [12] in which the following was discussed:

. . . . .

**12.** The record shows that a Motion to Revoke Probation in Cause No. 120568, was filed by the Criminal District Attorney on January 28, 1992.

The motion was founded on the pending charges of terroristic threat, criminal mischief, as well as Mathews failure to pay his required probation

Judge: What we're going to do is on those two charges you got.

Mathews: Yeah, that was what my son-in-law filed that on me.

Judge: So what about that stuff. That the only reason you're still on probation right now because they—they got those two charges pending until we get 'em rid of them, dismiss that—would he come in and sign a statement that he don't want to prosecute? .

Mathews: No, cause he's an asshole. I mean there's no way there.

Judge: But he doesn't want to prosecute it does he?

Mathews: I don't know, I didn't do nothing anyway.

Judge: I mean, here's the problem, if he doesn't come in and they'll set it, reset, we'll set it up so we need to sit down and either just get—get it over with real quick between the next month we'll get you off probation. What I'm gonna do is talk to Cook, I haven't seen that son of a bitch in a week and get him on, appointed on the case. You're still not working, right?

Mendez: Naw, he ain't—very little.

Judge: O.K. appoint him. And we'll just set it down for trial and we can have a trial like that we'll take him out and we can see what evidence—that once we got that case disposed of then you can get off probation on the other one.

Mendez: Uh, John, the man, he said that, that he had—he had to pay that 500 and something dollars probation.

Mathews: That's what I was—

Judge: No, that all can be waived, you're not working.

. . . . .

Mendez: That's what he can't understand, I promised that he didn't have to pay no money or nothing.

Judge: You're not working. you [sic] don't, you can't, you don't pay it, guarantee it.

fees and fine. The fees, fine, and costs in Cause No. 120568 were ordered waived by Respondent

Mathews: Where I's coming from is, you know, he told me that by the 28th to have that money there and to be there in his office the 28th or he would have me put in jail.

Judge: He can't do it. I'm the only one that can do it.

Mathews: And then, you know, then I was figuring, you know, I did that work for Danny and I gave you that 500 and then Danny told me that you wanted the other 500 before you—

Judge: That's all, guarantee you, I guarantee you, you, nothing's gonna happen. Now he can tell you anything he wants to but you're not working now; you're not making any money.

Mendez: Let me ask you something, John, can you give him something for him that you waive that in the meantime you know as far as the money and all that—

Judge: Well, here's what we'll do, we'll get Cook appointed on you, you come in here we'll have a hearing on that in open court and everything like that and you're not working and I'll waive it and nobody can say a damn thing. That way it's all over with, I'm talking about the probation part now, then you're off the hook on that. Cause this happens, you know, this happens all the time, we do this fifty times a month.

Mathews: I thought you couldn't do it because of those other charges.

Judge: No, no, no, I'm talking about waiving—

Mendez: The money.

Mathews: Oh the money.

. . . . .

Judge: You're not working; we waive this all the time. Waive the court costs, probation fees, fine, the whole thing. On the probation, getting you early termination, we can't get you off until you can resolve these threats or whatever, these other charges.

Mathews: Yeah, that I understand.

on March 6, 1992.

Judge: O.K. So this is two different things and I, uh, you want to do it on the 28th, that's like tomorrow.

Mathews: 28th of February. At first I was supposed to be in here the 28th of January.

Mendez: You got plenty of time.

Judge: Uh, if you want us to do it that way, we can resolve this other case before the 28th. You can come in and maybe get a, get off probation at the same time too. We'll just have a hearing, waive the fees and terminate the probation, just do it all in one boom, one swoop.

Mathews: They don't have a case, what if his word overrides mine and I end up being guilty.

Judge: Trust me. I've handled million of those kinda in-law cases and family cases and 99—

Mendez: Well see he don't, he don't know, that he don't really know that's why he's kinda—I told him, I said man, we're good as gold—

Judge: Nothings gonna happen to you, and, you know, especially since it's just all family. And it's bullshit.

We have carefully reviewed the evidence in the instant case that tends to support the Commission's findings and have disregarded all evidence and inferences to the contrary. The evidence, as detailed above, clearly shows that at the time Respondent privately met with Danny Mendez, Hollis Mathews was on misdemeanor probation as well as a defendant in a then-pending criminal proceeding. The object sought to be accom-

plished in the discussions between Respondent and Mendez was to effect the transfer of $500 from Mathews for the purpose of "taking care" of pending criminal matters. The conversations of January 9, 17, and 28, 1992 in which Respondent was an active participant reveal an understanding between the parties as to the course of action to be taken. The acts of Respondent were overt, unlawful, and sought to do damage to Hollis Mathews as well as to the judicial system that Respondent is charged to preserve.[13] We hold that there is more than a scintilla of evidence to support the questioned finding, i.e., that Respondent conspired with Danny Mendez to extort money from Hollis Mathews between July 10, 1991 and March 16, 1992. Consequently, Respondent's "no evidence" point must fail.

Respondent, in Point of Error No. Twenty-eight, has elected not to question the factual sufficiency of the evidence. Nonetheless, in the interest of justice, this Tribunal has examined all of the evidence in order to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. In so doing, we find that there is sufficient competent evidence of probative force to support the finding. Accordingly, we overrule Respondent's Point of Error No. Twenty-eight in its entirety.

### 4. *Ex parte* Communications

In Points of Error Nos. Six through Twenty-seven, Respondent asserts that the Commission erred in interpreting the law concerning *ex parte* communications with probationers. *See* TEX.CODE CRIM.PROC.ANN. art.

---

**13.** On review, Respondent erroneously seeks to apply the elements of a criminal rather than a civil conspiracy. The elements of a criminal conspiracy are: (1) a person; (2) with intent that a felony be committed; (3) agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (4) he or one or more of them performs an overt act in pursuance of the agreement. TEX.PENAL CODE ANN. § 15.02(a).

In the interest of justice, we apply Respondent's erroneous criteria to determine whether there is legally and factually sufficient evidence that Respondent intentionally offered, conferred, and agreed to confer on Hollis Mathews a benefit as consideration for Respondent's decision or

other exercise as a public servant. *See* TEX.PENAL CODE ANN. § 36.02. Once again we have carefully reviewed the evidence in the instant case that tends to support the Commission's findings, assuming as does Respondent that the elements of a criminal conspiracy are applicable, and have disregarded all evidence and inferences to the contrary. In so doing, we find that there is more than a scintilla of evidence to support the questioned finding. Further, we have examined all of the evidence in order to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that there is sufficient competent evidence of probative force to support the finding.

42.12(11)(a) (Vernon Supp.1994). In Point of Error No. Six, Respondent contends that the Commission erred in finding and concluding that Respondent's discussions with Hollis Mathews, without notice to and outside the presence of the District Attorney's office, constituted willful violations of Canons 1, 2, and 3A(5) of the Texas Code of Judicial Conduct.

It is axiomatic that an independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe high standards of conduct so that the integrity and independence of the judiciary is preserved. *See* TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Canon 1, Amended to April 1, 1988, *reprinted at* TEX.GOV'T CODE ANN., title 2, Subt. G, Appendix B (Vernon 1988). A judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. *Id.*, Canon 2A. In that regard, a judge should not allow family, social, or other relationships to influence judicial conduct or judgment; nor should a judge lend the prestige of the office to advance the private interests of the judge or others. *Id.*, Canon 2B. Every effort must be made to avoid conveying or permitting others to convey the impression that they are in a special position to influence the judge. *Id.*

The Texas Code of Judicial Conduct further provides that, except as authorized by law, a judge shall not directly or indirectly initiate, permit, or consider *ex parte* or other private communications concerning the merits of a pending or impending judicial proceeding. TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Canon 3A(5). *Ex parte* communications are "those that involve fewer than all of the parties who are legally entitled to be present during the discussion of any matter. They are barred in order to ensure that 'every person who is legally interested

in a proceeding [is given the] full right to be heard according to law.'" JEFFREY M. SHA-MAN, ET AL., JUDICIAL CONDUCT AND ETHICS, § 6.01 at 145 (1990). The principle underlying such prohibition, as it regards the disposition of criminal matters is quite simple: the disposition of criminal matters is the public's business and ought to be conducted in public in open court.[14] *See Tamminen v. State,* 644 S.W.2d 209, 217 (Tex.App.—San Antonio 1982), *aff'd in part and rev'd in part,* 653 S.W.2d 799 (Tex.Crim.App.1983); TEX.CODE CRIM.PROC.ANN. art. 1.24 (Vernon 1977).

Private adjudications fly in the face of our judicial system's abiding commitment to providing public access to civil and criminal proceedings and records. *See Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). Our form of government is rooted in a recognition of the importance of open and public proceedings. Subjecting judicial proceedings to public scrutiny accomplishes two important goals. First, it provides the public with an opportunity to exercise its right to monitor and evaluate its judicial system. Second, and equally important, a judge's knowledge that his or her actions are not shrouded in secrecy fosters a stronger commitment to strict conscientiousness in the performance of judicial duties. Our courts have recognized that secret tribunals exhibit abuses that are absent when the public has access to judicial proceedings and records. *See Express–News Corp. v. Spears,* 766 S.W.2d 885, 890 (Tex. App.—San Antonio 1989, orig. proceeding [leave denied]) (Cadena, C.J. dissenting). The judiciary has no special privilege to suppress or conduct in private proceedings involving the adjudication of causes before it. In fact, such secrecy frustrates the judiciary's responsibility to promote and provide fair and equal treatment to all parties. Individual judges are charged with the task of adjudicating claims in a manner that protects the rights of both parties. A judge's private

14. It is readily recognized that the public's right to require the disposition of criminal matters in open court is not absolute; limitations on public attendance may be imposed so long as they are no more exclusive than necessary to protect a state interest that outweighs the appellant's interest in public scrutiny of the proceedings. *Mosby v. State,* 703 S.W.2d 714 (Tex.App.—Corpus Christi 1985, no pet.) *citing Rovinsky v. McKaskle,* 722 F.2d 197 (5th Cir.1984) (Jolly, J., dissenting) (Reh'g denied).

communications with either party undermine the public's right to evaluate whether justice is being done and removes an important incentive to the efficient resolution of cases.

■ The record shows that Hollis Mathews appeared in Respondent's court on August 28, 1991 and pleaded *nolo contendere* to the charges of driving while intoxicated in Cause Nos. 116856 and 120568. Mathews was sentenced by Respondent to 3 days in jail and a $100 fine in the first case and 2 years in jail, probated for 2 years, and a $1,000 fine in the second case. Mathews testified that shortly after his appearance in court, he talked to Respondent at Efren's Paint & Body Shop in Texas City. Mathews further testified that during this conversation, at which only he, Respondent, and Danny Mendez were present, Respondent told him "not to worry about it, that he [Respondent] would take care of it in two or three months," and that "he would have it all waived, dismissed." [15]

As noted in our discussion of Points of Error Nos. One and Two, the record shows that several more conversations about the status of Mathews' probation took place between Mathews and Respondent. These conversations were tape recorded, and duplicates of the original recordings were admitted into evidence and were listened to and considered by the Special Master. As extensively addressed in Respondent's Point of Error No. Twenty-eight, the taped conversations included discussions held January 9, 1992, January 17, 1992, and January 28, 1992. Further, the record shows that on March 6, 1992, a conversation took place in Respondent's chambers at the Galveston County Courthouse between Danny Mendez and Respondent, in the presence of Hollis Mathews, in which the following was discussed:

Mendez: Mr. John Thoma—

Judge: —Did you go by and talk to Mr. Pacheco?

Mendez: Yes, sir. I went by and talked to, not to Pacheco, this is a new guy, and I talked to him and I told him what you said and he said O.K., no problem. He said to give him a call.

Judge: Goudeau—

Mendez: I told him that you were waiving the fees and, you know, he's a good old guy. What we gonna do [sic] the weekend John?

Judge: I gotta go to Austin. To take Eve up there to college.

Mendez: I thought you meant you were going to get your head examined.

Judge: Maybe.

Mendez: Heeee—

Judge: [On telephone] Mr. Goudeau, please. Bernard, this is Judge Thoma at the courthouse. Oh, pretty good. Uh, listen, did, we've got a fellow that's on probation, been on for a while, by the name of Hollis Mathews. Oh, O.K. then, I just double checking to see if he had come, come over, there. Uh, I know his old employer and would follow him and this guy is just down on his luck. Is there any problem with me waiving the fees to give him a chance to get back up again? Uh-huh. Sure, no problem. Yeah, I'm at 233. Uh-huh, O.K., no problem.

Judge: He's going to check with his supervisor said no problem, so we can do that today.

Mendez: Well what you want, you want us to hang around here.

Judge: If you want to, there's no reason to.

Mendez: Well you know what, what I was going to do is get the sheet, you know, where you waived everything.

Judge: Yeah, uh, why don't you come on out here and get Carolyn to bring that up—

Additionally, on March 21, 1992, a conversation took place at Efren's Paint & Body Shop between Hollis Mathews and Respondent in which the following was discussed:

Mathews: How you been?

---

**15.** The record shows that at the hearing before the Special Master, Hollis Mathews testified that he understood his discussions with Respondent to mean that his fines, probation fees, and court costs would be waived.

Judge: I'll tell you what—after today. This is the third day in a row I've not drawn a sober breath. Setting this thing up—tomorrow just stay home, turn the T.V. on.

Mathews: Kick back, forget about it.

Judge: Eat some oatmeal—

Mathews: —Danny—

Judge: Yeah—

Mathews: I didn't want to keep bugging you; I just, you know, I got all upset about that deal and I want [sic] make sure that Danny gave you that money and everything. Did he?

Judge: Uh, yeah, that parts done, then, then. You're straight with him, Danny?

Mathews: Yeah, yeah.

Judge: O.K.

Mathews: But he gave you that other 500 that I gave him the other day?

Judge: Everything is waived, and everything is, you're O.K., right?

Mathews: Yeah.

Judge: O.K.

Mathews: See, I've got, the reason I want to make sure, see, is I've gotta go back in front of you the 30th. On that son-in-law matter.

Judge: Yeah, listen. Let me ask you something; is he gonna continue to press charges?

Mathews: Yeah.

Judge: You're still not working, right?

Mathews: I'm working some, yeah, now.

Judge: What would you say you're making a month?

Mathews: It varies; when it's good, I make good money,—

Judge: But when you're not, you don't.

Mathews: When I'm not, I don't make nothing. Sometimes I might make, uh, might make a 1,000 dollars in 3 or 4 days; then I might go 30 days and not make a penny.

Judge: Well, when you're there the 30th let's see how it's going because I what uh, uh, if you're not then we need to appoint you an attorney and let him take care of it, cause, uh, you don't, you don't want to handle that yourself.

At each of the above conversations, Mathews and Respondent openly discussed what steps they would take to get the fines, fees, and costs of Mathews' probation waived and the case dismissed. It is undisputed that the District Attorney's office had no knowledge of any of the above meetings, discussions, and arrangements between Mathews and Respondent, and further, that a representative from the District Attorney's office was never present during any of these discussions. The record clearly establishes that Respondent permitted, participated in, and considered private communications concerning the merits of Hollis Mathews' pending, as well as impending, judicial proceeding, i.e., the ongoing probationary period as well as the prospective waiver of monetary conditions of probation and the ultimate dismissal of the criminal matter. Thus, the question presented is not whether any such discussions took place, but rather, whether the above discussions were authorized by law.

 Respondent correctly describes the relationship that exists between a trial judge and a probationer as contractual in nature, in that the judge agrees with the criminal defendant that clemency by way of probation will be extended if the defendant will agree to perform certain requirements and conditions. *Espinoza v. State*, 486 S.W.2d 315, 316 (Tex.Crim.App.1972) *citing McDonald v. State*, 442 S.W.2d 386 (Tex.Crim.App.1969) and *Glenn v. State*, 168 Tex.Crim. 312, 327 S.W.2d 763, 764 (1959). Moreover, on review, both the Commission and Respondent concede that a trial judge having continuing jurisdiction over a probationer may at any time during the period of probation alter or modify the conditions of such probation. TEX.CODE CRIM.PROC.ANN. art. 42.12(11)(a) (Vernon Supp.1994).[16] Respondent, however,

---

**16.** Article 42.12(11)(a) (Vernon Supp.1994) of the Texas Code of Criminal Procedure states in pertinent part as follows:

The court having jurisdiction of the case shall determine the terms and conditions of probation and may, at any time, during the period of probation alter or modify the conditions....

goes further by contending that a judge is statutorily authorized to modify or alter conditions of probation at any time and at any place, to the exclusion of all other parties who may have an interest in the proceedings. We strongly disagree.

■ The citizens of Texas, and especially the parties who may have an interest in the proceedings, are entitled to see and hear what goes on in the courts of our state.[17] *See* TEX.CODE CRIM.PROC.ANN. art. 1.24. A modification of probation, although administrative in nature, is nonetheless a facet of a criminal proceeding in which society has an interest.[18] It is a proceeding to which a probationer and the District Attorney are entitled to notice and, if desired, an opportunity to be present and heard, if a hearing is not otherwise waived or required.

■ As noted in response to Point of Error No. Twenty-eight, the evidence clearly shows that at the time Respondent privately met with Hollis Mathews, Mathews was on misdemeanor probation, and later was a defendant in a then-pending criminal proceeding. The discussions were not communications concerning uncontested administrative or uncontested procedural matters, but rather, were designed to "take care" of pending criminal matters. The acts of Respondent were overt, unlawful, willful, and ultimately sought to do damage to Mathews as well as the citizens of Texas by depriving the parties of their day in court. Furthermore, Respondent's disposition of Criminal Cause No. 120568 outside the courtroom when court was not in session improperly removed the proceeding from the public domain where it belonged and made it instead a private matter between him and a probationer/defendant. It is for that reason that in the instant case we cannot concur with Respondent's assertion that a judge may unilaterally and without notice to the District Attorney, modify the terms and conditions of probation at any time and in any place, including paint and body shops, stairwells, private office spaces, and barbecues.[19] Respondent's *ex parte* communication and ultimate resolution of a criminal matter out of court, serves to suggest to the citizens of our state that judges, who are sworn to impartiality, are entitled to implement an "open door policy," which may be available to a select predetermined constituency. An "open door policy," or the disposition of any case for reasons other than an honest and open appraisal of the facts and law as disclosed by the evidence and the advocacy of both parties, undermines the integrity of the courts, breeds skepticism and distrust, and thwarts the principles on which the judicial system is based. *See Sun Exploration & Prod. Co. v. Jackson,* 783 S.W.2d 202, 206 (Tex.1989) (Spears, J. concurring). Given the above, we find that Respondent's private communications with Hol-

---

17. The Court of Criminal Appeals, in *Houston Chronicle Pub. Co. v. Shaver,* stated that TEX.CODE CRIM.PROC.ANN. art. 1.24 is a lasting expression of the legislative will to implement those rights and policies, so that a right of access to "proceedings and trials in all courts" in the public in general and the press in particular prevails. *Houston Chronicle Pub. Co. v. Shaver,* 630 S.W.2d 927, 932 (Tex.Crim.App.1982).

18. As a minimum, we note that the TEXAS CONST. art. I, § 30 and TEX.CODE CRIM.PROC.ANN. art. 56.-02(a)(3) provide that a crime victim has the right, if requested, to be informed of relevant court proceedings and to be informed if those court proceedings have been canceled or rescheduled. This right would be rendered meaningless if such relevant proceedings were allowed to be conducted in stairwells, private offices, or the back room of a paint and body shop. We further note that, fortunately, there was no direct victim of Mathews' crime of driving while under the influence of alcohol. *See* TEX.CODE CRIM.PROC.ANN. art. 56.01(3). This fact, however, does not vitiate the purpose of this rule—that criminal proceedings be open for the scrutiny of all interested parties, including the State of Texas through its representatives in the district or county attorney's offices.

19. It is true that Respondent could have pronounced in open court the same modifications to probation that he had previously pronounced while "holding court" at the local paint and body shop. This exhortation, however, misses the point and denotes insensitivity to the basic principle that the disposition of any criminal case should be made in open court, where the representative of the public, in the form of a District or County Attorney, if he or she desires, may be heard. The gravamen of this matter is that the citizens of Texas were not allowed their day in court. In the instant case, had notice been given, the District Attorney may have acquiesced in the judge's decision, or might have voiced opposition to the denial of the receipt of previously imposed fines and costs to which the State of Texas was entitled.

lis Mathews concerning the merits of his then-pending probation and its conditions, as well as his impending modification of such conditions of probation, to be *ex parte* communications, not authorized by law. Accordingly, Respondent's Point of Error No. Six is overruled.

■ In Point of Error No. Seven, Respondent asserts that the Commission erred in finding and concluding that the *ex parte* communications between Mathews and Respondent on November 12, 1991, January 9, 1992, January 28, 1992, March 6, 1992, and March 21, 1992 constituted persistent conduct in violation of Article V, § 1–a(6)A of the Texas Constitution. Unlike the contention in Point of Error No. Twenty-eight, Respondent does not challenge the definition of the word "persistent," as applied to the facts of the instant case. "Persistent," in its common usage, means continuing or inclined to continue in a course without a change in function or structure. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 877 (1984).

Whether or not a continuing course of conduct is persistent is a question of fact. The evidence in the instant case clearly establishes that at the time Respondent privately met with Hollis Mathews on January 9, 1992, January 17, 1992, January 28, 1992, March 6, 1992, and March 21, 1992, Mathews was on misdemeanor probation and was a defendant in a then-pending criminal proceeding. The discussions were not communications concerning uncontested administrative or procedural matters, but were instead designed to "take care" of pending criminal matters. On November 12, 1991, Mathews was on misdemeanor probation and met privately with Respondent about the loss of his driver's license. Mathews testified that at the time of the discussions, no member of the District Attorney's office was present, nor was there any such representative present at the time his license was granted.

We have examined all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that there is sufficient competent evidence of probative force to support the Commission's finding and conclusion that

the *ex parte* communications conducted by and between Respondent and Hollis Mathews on November 12, 1991, January 9, 1992, January 28, 1992, March 6, 1992 and March 21, 1992, were persistent and in violation of Respondent's duties as mandated by the Texas Constitution. Accordingly, Respondent's Point of Error No. Seven is overruled.

■ In Points of Error Nos. Ten and Twenty-one, Respondent asserts in identical fashion that the Commission erred in finding and concluding that the *ex parte* actions of Respondent in waiving fees, costs, and fines in Cause No. 120568, Mathews' second conviction for driving while intoxicated, was a willful violation of Canon 3A(4) of the Texas Code of Judicial Conduct. In Point of Error No. Twenty-six, Respondent likewise asserts that the Commission erred in finding and concluding that his *ex parte* action of making a misleading docket entry to the same effect, was a willful violation of Canons 2A of the Texas Code of Judicial Conduct.

Canon 3A(4) provides that a judge shall accord to every person who is legally interested in a proceeding, or his or her lawyer, the full right to be heard according to law. Canon 2A provides that a judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

The record shows that at the hearing before the Special Master, Mathews' probation officer, Warrington Bernard Goudeau, III, testified that Mathews reported to him on March 6, 1992. At the time of this reporting, Mathews was not in good standing regarding his probation because he had not reported as scheduled, had failed to complete the mandatory D.W.I. class, and was in arrears on his payments of probation fees. Officer Goudeau further testified that Mathews informed him during this March 6 meeting that Respondent was going to waive his fees and the D.W.I. class. Officer Goudeau stated that after his meeting with Mathews, he spoke with Respondent by telephone at which time he informed Respondent that he would not recommend waiving the fees. The record indicates that contrary to Officer Goudeau's

recommendation, the fees, costs, and fine in Mathews' probation were waived by Respondent on March 6, 1992. A handwritten entry on the docket sheet reads:

MAR 06, 1992—Fees and costs and fine waived; coordinated with Probation Department's Mr. Goudeau.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. In so doing, we hold that Respondent, in unilaterally deciding that Mathews was not working and was thus unable to pay his fees, costs, and fines, effectively made a factual determination without the benefit of a hearing on the issue. The evidence shows that the District Attorney's office was wholly denied the opportunity to be heard. The evidence further shows that Officer Goudeau testified that he opposed waiving Mathews' fees, costs, and class attendance, although the docket entry suggests otherwise. In that regard, we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that the *ex parte* action of Respondent in waiving fees, costs, and fines in Cause No. 120568, Mathews' second conviction for driving while intoxicated, was a willful violation of Canon 3A(4). We further find sufficient competent evidence of probative force to support the Commission's finding and conclusion that Respondent's making of a misleading docket entry to the same effect was a willful violation of Canon 2A of the Texas Code of Judicial Conduct in that such conduct served to diminish public confidence in the integrity and impartiality of the judiciary. Accordingly, Respondent's Points of Error Nos. Ten, Twenty-one, and Twenty-six are overruled.

In Point of Error No. Eight, Respondent asserts that the Commission erred in finding and concluding that Respondent's *ex parte* conversations with Jorge Lozano between July 19, 1991 and October 23, 1991 constituted willful violations of Canon 3A(5) of the Code of Judicial Conduct. Also, in Point of Error No. Sixteen, Respondent asserts that the Commission erred in finding and concluding that Respondent's *ex parte* action on October 23, 1991 in waiving the fine

in Lozano's probation constituted a willful violation of Canons 2, 2A, and 3A(4).

The record shows that on July 10, 1991, Lozano pleaded guilty to charges of solicitation of prostitution in Cause No. 120657, then pending in Respondent's court. Respondent fined Lozano $600 and sentenced him to 6 months in jail, probated for a period of 6 months.

Lozano testified at the hearing before the Special Master, stating that he occasionally did upholstery work at Efren's Paint & Body Shop. Lozano also testified that during the period in which he was on probation, he had occasion to speak with Respondent and further stated that he had repaired a seat in Respondent's car. Lozano stated that he did not charge Respondent for the work, but rather, did it as a "favor." When the Examiner asked if Respondent had helped him while on probation, Lozano answered, "Yes."

The record shows an order in Cause No. 120657, dated October 23, 1991, which states: "Upon this day came on to be heard the above entitled and numbered cause, whereupon Defendant Indigent, Fine waived." The record also shows a handwritten entry in the docket sheet noting the waiver of the fine on October 23, 1991.

The record further shows that during the hearing before the Special Master, Kurt Sistrunk, chief of misdemeanors in the Galveston County District Attorney's Office from October 1991 through January 1992, testified that he was never notified of any hearing on October 23, 1991 in the Lozano case. We have examined all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that sufficient competent evidence of probative force supports the Commission's finding and conclusion that Respondent's *ex parte* conversations with Jorge Lozano between July 19, 1991 and October 23, 1991 constituted willful violations of Canon 3A(5) of the Code of Judicial Conduct. Further, we find sufficient competent evidence of probative force supporting the Commission's finding and conclusion that Respondent's *ex parte* action on October 23, 1991 in waiving

the fine in Lozano's probation constituted a willful violation of Canons 2, 2A, and 3A(4). Accordingly, Respondent's Points of Error Nos. Eight and Sixteen are overruled.

In Point of Error No. Nine, Respondent asserts that the Commission erred in finding and concluding that his *ex parte* communications with Jose A. Vargas, Jr. on August 10, 1992 and December 3, 1992 constituted willful violations of Canon 3A(5). The record shows that on March 12, 1992, Vargas pleaded guilty to the charge of driving while intoxicated in Cause No. 124196, then pending in Respondent's court. Respondent sentenced Vargas to a fine of $500 and 1 year in jail, probated for 2 years.

Vargas testified at the hearing before the Special Master and stated that while he was on probation, he spoke with Respondent "a few times" about his case. Evidence as to the substance of these conversations is in the chronological record sheet of Vargas' probation kept by the adult probation department. This record sheet contains an entry dated July 20, 1992 stating that Respondent had called the probation department to check on the eligibility of Vargas for early termination. During this conversation, Respondent indicated to the probation department that Vargas' probation was for 1 year rather than 2 years. The entry dated August 10, 1992 reads as follows:

Judge Thoma called and said Jose was there re: his [sic] getting off probation. I told the judge we obtained a copy of the docket sheet and it has 24 months probated term. I also told him [defendant] can get an early term [sic] in November 1992. Judge Thoma said the [defendant] was a little slow however he'll send Jose to me.

Finally, the December 3, 1992 entry reads:

Judge Thoma called & said Jose had just left requesting an E.T. (early termination) and he told him to come & see me. He also told [defendant] to catch his fee arrears up. Judge said Jose is eligible for an E.T.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust.

We hold that the evidence is factually insufficient and lacking in probative force to support the Commission's finding and conclusion that Respondent's *ex parte* conversations with Jose A. Vargas, Jr. on August 10, 1992 and December 3, 1992 constituted willful violations of Canon 3A(5) of the Code of Judicial Conduct. Although the evidence is factually insufficient, we hold that such lack of evidence did not cause, nor could it be reasonably calculated to have caused, the rendition of an improper recommendation, given the facts of the instant case. TEX.R.APP.P. 81(b)(1). We sustain Respondent's Point of Error No. Nine, but find such error to be harmless.

In Points of Error Nos. Twelve, Thirteen, Fourteen, Fifteen, and Twenty-seven, Respondent asserts that the Commission erred in finding and concluding that Respondent's *ex parte* actions in favor of Daniel Mendez, which include waiving his D.W.I. court class and ordering his driver's license and privileges not suspended, waiving his probation fees, reducing his sentence and terminating probation, and granting a new trial, were willful violations of Canons 1, 2B, 3A(4), and 3A(5). Respondent further asserts that the Commission erred in finding and concluding that these willful actions constituted persistent conduct in violation of Article V, § 1-a(6)A of the Texas Constitution.

The record shows that on January 27, 1989, Mendez, a close acquaintance of Respondent, pleaded guilty to the misdemeanor charge of driving while intoxicated in Cause No. 100758, then pending in Respondent's court. Respondent sentenced Mendez to a fine of $100 and 1 year in jail, probated for 2 years. Thereafter, Mendez filed a motion for new trial on February 13, 1989. The motion was set for hearing on the same day and was granted that day by Respondent. As a result of Respondent's granting the new trial, the case was reinstated on the docket. On April 10, 1989, the District Attorney filed a Motion to Vacate Order Granting New Trial and to Reinstate Conviction, asserting that the State was not notified of the motion for new trial, setting, or disposition of the motion for new trial. On April 10, 1989, Respondent granted this motion to vacate the order

granting Mendez a new trial and reinstated the original conviction and sentence. The next day, April 11, 1989, Respondent waived the D.W.I. class and ordered that Mendez' driver's license and privileges not be suspended. On September 5, 1989, a handwritten docket entry, initialed by Respondent, states: "Fees waived for good cause shown." Finally, on October 6, 1989, Respondent granted Mendez' motion to reduce sentence and terminate probation.

The record further shows that Ned Barnett testified at the hearing before the Special Master that he was chief of misdemeanors in the Galveston County District Attorney's Office during most of 1989. Barnett testified that, as chief of misdemeanors, he was not notified of Mendez' motion for new trial before it was granted by Respondent. Barnett further testified that, although the April 11, 1989 order waiving the D.W.I. class states: "Upon this day came on to be heard . . ." he was never notified of any hearing on that date in that case. The record also shows that Barnett was not notified of any hearings or motions prior to the September 5 and October 6 orders by Respondent.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that Respondent, in unilaterally deciding Mendez' motion for new trial, in entering the order that Mendez' driver's license and privileges not be suspended, in finding that "good cause" existed for the waiver of previously imposed fees, and in entering an order reducing Mendez' sentence and terminating his probation, effectively made factual determinations without the benefit of a hearing on these issues. The evidence shows that the District Attorney's office was wholly denied the opportunity to be heard on the issue. In that regard, we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that the *ex parte* actions of Respondent were willful violations of Canon 1, 2B, 3A(4), and 3A(5) as alleged. Further, as addressed in Respondent's Point of Error No. Seven above, the question whether a continuing course of conduct is or is not persistent is likewise a question of fact requiring that we examine all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. Having done so, we find sufficient competent evidence of probative force to support the Commission's findings and conclusion that the above *ex parte* actions by Respondent constituted persistent conduct in violation of Article V, § 1–a(6)A of the Texas Constitution. Accordingly, Respondent's Points of Error Nos. Twelve, Thirteen, Fourteen, Fifteen, and Twenty-seven are overruled.

■ In Point of Error No. Seventeen, Respondent asserts that the Commission erred in finding and concluding that Respondent's *ex parte* action of reducing the sentence and terminating probation for Felipe Herrera was a willful violation of Canons 2 and 3A(4). The record shows that on April 30, 1991, Herrera pleaded *nolo contendere* to the offense of reckless conduct in Cause No. 117755, then pending in Respondent's court. Respondent fined Herrera $1,000 and sentenced him to 1 year in jail, probated for 1 year. The record further shows that on November 12, 1991, Herrera filed a Motion to Reduce Sentence and Terminate Probation, stating in the motion that he had successfully completed more than one-third of the original probationary period. Respondent signed an order reducing sentence and terminating probation that same day; said order reciting that Herrera had satisfactorily completed seven months of his probationary period and complied with all of the terms and conditions of his probation. On November 18, 1991, Kurt Sistrunk of the Galveston County District Attorney's Office filed a Motion to Set Aside Order Reducing Sentence and Terminating Probation, asserting that Herrera had not satisfactorily completed one-third of the original probationary period. In support of this motion, an affidavit from Julia D. White, supervisor of the misdemeanor probation department, was attached. In her affidavit, White states that Herrera had failed to report to the probation department and pay his probation fees as ordered, and therefore had not satisfactorily completed the conditions of his probation as ordered by Respondent. Sistrunk testified at the hear-

ing before the Special Master that his office was not notified of Herrera's Motion to Reduce Sentence and Terminate Probation.[20]

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that Respondent, in the *ex parte* action of unilaterally deciding that Felipe Herrera had satisfactorily completed one-third of the original probationary period as well as complying with all the terms and conditions of probation, effectively made factual determinations without the benefit of a hearing on these issues. The evidence shows that the District Attorney's office was wholly denied the opportunity to be heard. In that regard, we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that the *ex parte* actions of Respondent were willful violations of Canons 2 and 3A(4) as alleged. Accordingly, Respondent's Point of Error No. Seventeen is overruled.

■ In Points of Error Nos. Eleven, Eighteen and Nineteen, Respondent asserts that the Commission erred in finding and concluding that Respondent's *ex parte* actions, in favor of Linda Hernandez, of waiving attorney's fees, court costs, and D.W.I. class and reducing sentence and terminating probation were willful violations of Canons 2 and 3A(4). Because Point of Error No. Eleven is identical to Point of Error No. Nineteen, we will address both as a single point.

The record in the instant case regarding Hernandez' case is somewhat irregular, at best. A handwritten docket entry, initialed by Respondent, shows that on May 6, 1991, Hernandez pleaded *nolo contendere* and was found guilty of reckless conduct in Cause No. 118925 in Respondent's court. This entry is marked through, however, and the word "delete" is handwritten next to the entry, also initialled by Respondent. No date is given for the "delete" entry.

The record then shows a separate misdemeanor probation judgment with the same cause number signed by Respondent on May 21, 1991. This judgment shows that Hernandez pleaded *nolo contendere* to the charge of driving while intoxicated and was fined by Respondent $300 and sentenced to 1 year in jail, probated for 1 year. The record further shows a docket entry and order, dated June 20, 1991, waiving attorney's fees, court costs, and D.W.I. court class. Finally, the record contains an Order Reducing Sentence and Terminating Probation signed by Respondent and filed on January 7, 1992. This order also bears the signature of attorney Gilbert Torres. The order is dated January 7, 1992, but this date is handwritten above a stamped date of November 12, 1991 found in two places on the face of the order. The record does not include any motion or order setting a hearing on the waiver of fees, costs, and D.W.I. class or a motion to reduce sentence and terminate probation or order setting a hearing thereon.

At the hearing before the Special Master, Gilbert Torres testified that he knows Linda Hernandez, but that he has never performed any legal work for her. Torres specifically testified that he could not recall in any way approving the order to reduce sentence and terminate probation for Hernandez and could not provide any explanation as to how his signature appeared on the order. He further testified that he did not file any type of motion to reduce sentence on behalf of Hernandez.

We note here that Torres testified that he did sign and file a blank motion to reduce sentence and terminate probation in Felipe Herrera's case, as discussed in Point of Error No. Seventeen. The motion in Herrera's case was stamp-dated November 12, 1991, and the order reducing sentence and terminating probation for Herrera was also stamp-dated November 12, 1991. Thus, the record before this Tribunal includes: (1) a motion to reduce sentence for Felipe Herrera stamp-dated November 12, 1991 and signed by Gilbert Torres; (2) an order reducing sentence for Felipe Herrera stamp-dated November

---

20. The record shows that Sistrunk later sent a letter to Respondent requesting that the District Attorney's office be notified and given an opportunity to be heard on motions presented to the court on behalf of defendants, particularly motions to reduce sentence and terminate probation.

12, 1991 but not signed by Gilbert Torres; and (3) an order reducing sentence for Linda Hernandez with the stamp-date of November 12, 1991 crossed out and a handwritten date of January 7, 1992 added, signed by Gilbert Torres.

The record in the instant case also includes the testimony of Linda Hernandez at the hearing before the Special Master. Hernandez testified that she knows Daniel Mendez, a friend of Respondent, and that she spoke with Mendez about her D.W.I. charge. She further testified that Mendez advised her what to do about the charge and appeared with her in court the first time she appeared before Respondent. Finally, Ted Bishop testified at the hearing before the Special Master. Bishop was the attorney appointed to represent Hernandez during her plea on May 21, 1991. Bishop testified that he was present when she entered her plea, but that he did not represent her at any subsequent proceedings and did not file for her a motion to reduce sentence.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that Respondent, by unilaterally entering an order reducing and terminating probation in favor of Linda Hernandez, effectively made a factual determination without the benefit of a hearing on the issue. The evidence shows that the District Attorney's office was wholly denied the opportunity to be heard on the issue. In that regard, we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that the *ex parte* action of Respondent in entering such an order constituted a willful violation of Canons 2 and 3A(4). Accordingly, Respondent's Points of Error Nos. Eleven, Eighteen, and Nineteen are overruled.

In Point of Error No. Twenty, Respondent asserts that the Commission erred in finding and concluding that Respondent's *ex parte* action of waiving the balance of the fines and fees then owed by probationer Annette Sanchez was a willful violation of Canon 3A(4).

The record shows that on September 25, 1989, Sanchez pleaded guilty to the offense of driving while intoxicated in Cause No. 105546, then pending in Respondent's court. Respondent fined Sanchez $1,000 and sentenced him to 2 years in jail, probated for a term of 2 years. The record further includes an order dated November 26, 1990 which states: "Upon this day came on to be heard the above entitled and numbered cause, whereupon balance of fine and fee waived."

The record reveals that during her testimony at the hearing before the Special Master, Sanchez could not remember her fines and fees ever being waived. Evidence relating to this waiver of fines and fees is found in the chronological record sheet of Sanchez' probation kept by the adult probation department. This sheet includes an entry dated November 26, 1990 that states, "Judge Thoma called P.O. (probation officer) to see how the [defendant] was doing. . . ." The next entry, dated December 12, 1990, states, "[Defendant] brought in Docket Sheet. Probation fees supposedly waived. . . ." The January 2, 1991 entry reads, "Received docket & order—waiving fine & fee."

We have examined all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. In so doing, we hold that Respondent, in unilaterally entering an order waiving the balance of fines and fees previously imposed, effectively made a factual determination without the benefit of a hearing on the issue. The testimony supports the inference that neither the adult probation department nor the District Attorney's office were afforded notice that Respondent was going to waive Sanchez' fine and fees or otherwise conduct a hearing on these issues, as suggested in his order dated November 6, 1990. In that regard, we hold that sufficient competent evidence of probative force supports the Commission's finding and conclusion that the *ex parte* action of Respondent in waiving the balance of fines and costs in Cause No. 105546 was a willful violation of Canon 3A(4). Respondent's Point of Error No. Twenty is overruled.

In Point of Error No. Twenty-two, Respondent asserts that the Commission erred in finding and concluding that Respondent's *ex parte* actions of granting credit for time served in excess of time actually served were contrary to law and consequently willful violations of Canon 3A(1). *See* TEX.CODE CRIM.PROC.ANN. art. 42.03 § 2(a) (Vernon Supp.1994). These charges leveled by the Commission arise from Respondent's handling of the following cases: Linda Hernandez, Cause No. 118925; Jesus Claudio Miranda, Cause No. 125260; Rudolfo Garcia Mora, Cause No. 120910; Jose A. Vargas, Jr., Cause No. 124196; Annette Julie Sanchez, Cause No. 105546; William Hiram Shaw, Cause No. 116604; Vincent Flisowski, Cause No. 110854; Louis Rangel Sendejas, Jr., Cause No. 99429; and E.B. Anthony Jaurigue, Jr., Cause No. 111470.

The record shows that Linda Hernandez testified before the Special Master and stated that she spent "some" time in jail on her D.W.I. charge, but could not remember how much time. Her jail record indicates that she was arrested on February 23, 1991 at 2:00 a.m. and was booked into jail at 3:45 a.m. that same morning. She was subsequently released at 10:10 a.m., having spent approximately 6 and ½ hours in jail. The docket sheet in her case shows that she was given credit by Respondent for 6 days' served.

Jose A. Vargas, Jr. testified at the hearing before the Special Master that he spent approximately 5 or 6 hours in jail on his D.W.I. charge. His jail record indicates that he was arrested on October 20, 1991 at 11:30 p.m. and was booked into jail at 2:15 a.m. on October 21, 1991, spending approximately one day in jail. The docket sheet in his case reveals that he was given credit by Respondent for 12 days' served.

Annette Julie Sanchez testified at the hearing before the Special Master that she spent approximately 3 or 4 days in jail on her D.W.I. charge. Her jail record indicates that she was arrested on April 14, 1989 at 11:10 p.m. and booked into jail at 2:00 a.m. on April 15, 1989, and then spent two days in jail. The docket sheet and an order in her case

reveals that she was given credit by Respondent for 15 days' served.

The documentary evidence shows that Jesus Claudio Miranda was arrested following a family disturbance on December 2, 1991 at 2:40 a.m. and was booked into jail at 6:45 a.m. that morning. He was subsequently released later that day at 5:15 p.m., earning 1 day credit. The docket sheet in his case reveals that he was given credit by Respondent for 6 days' served.

The record shows that Rudolfo Garcia Mora was arrested on May 21, 1991 at 5:43 p.m. for solicitation of prostitution and was booked into jail at 9:30 p.m. that day. He was subsequently released on May 22, 1991 at 12:35 p.m., earning 2 days' credit. The docket sheet in his case reveals that he was given credit by Respondent for 8 days' served.

The record shows that William Hiram Shaw was arrested for solicitation of prostitution on November 30, 1990 at 7:45 p.m. and was booked into jail on December 1, 1990 at 1:30 a.m. He was subsequently released 5 minutes later. The Commission found that Shaw earned 2 days' credit. The docket sheet and an order in his case reveals that he was given credit by Respondent for 12 days' served.

The record shows that Vincent Flisowski was arrested for driving while intoxicated on December 14, 1989 at 11:30 p.m. and was booked into jail at 2:15 a.m. on December 15, 1989. He was released later that morning at 11:15 a.m., earning 2 days' credit. Respondent's order reveals that he was given credit for 10 days' served.

The record shows that E.B. Anthony Jaurigue, Jr. was arrested for driving while intoxicated on March 18, 1990 at 2:00 a.m. and booked into jail at 5:10 a.m. that same day. He was subsequently released at 1:45 p.m. later that day, earning 1 day of credit. Nonetheless, the docket sheet in his case reveals that he was given credit by Respondent for 10 days' served.

Finally, the record shows that Louis Rangel Sendejas, Jr. was arrested for driving while intoxicated on July 17, 1988 at 11:51 p.m. He was booked into jail on July 17,

1988 at 2:50 p.m. [sic]. The documentary evidence further shows that he was released on July 17, 1988 at 5:00 p.m. The Commission found that he was entitled to 2 days' credit, although there are obvious and irreconcilable differences with the above dates and times. The docket sheet in his case reveals that he was given credit by Respondent for 10 days' served. Nonetheless, in light of the above significant questions as to when Sendejas was arrested, booked, and ultimately released, the evidence is factually insufficient to support the Commission's findings as to this instance.

TEX.CODE CRIM.PROC.ANN. art. 42.03 provides in pertinent part:

> Sec. 2. (a) In all criminal cases the judge of the court in which the defendant was convicted shall give the defendant credit on his sentence for the time that the defendant has spent in jail in said cause, other than confinement served as a condition of community supervision, from the time of his arrest and confinement until his sentence by the trial court.

Article II, § 1 of the Texas Constitution sets forth the separation of powers doctrine prohibiting one branch or department of government from exercising any power properly assigned to another except when expressly permitted in the Constitution. *Ex parte Hayward,* 711 S.W.2d 652, 655 (Tex.Crim. App.1986). In that regard, courts have no power to legislate. *Id., citing Ex parte Myer,* 84 Tex.Cr. 288, 207 S.W. 100, 107 (App.1918). Without that power, courts lack the authority to establish penalties for an offense under the penal laws of this state. Consequently, courts lack the discretion to impose a sentence not provided for by law. That is particularly true in determining the credit a criminal defendant may be entitled to on his sentence for the time that defendant has spent in jail awaiting disposition of his case. The law does not authorize a court to give credit for non-custody time as was done in the instant case. TEX.CODE CRIM. PROC.ANN. art. 42.03(2)(a); *Ex parte Hay-*

*ward,* 711 S.W.2d at 656. The sentences Respondent ultimately imposed went beyond the scope of existing law, regardless of the reason for such modification. Consequently, Respondent's actions in ordering a sentence that involved credits not authorized by law were misleading to the public, were in direct violation of established law, and thus, were unlawful. Sentences such as those described above cast public discredit upon the judiciary and the administration of justice and are condemned. Truth in sentencing is essential to public confidence in the judiciary for no other reason than it is right.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that Respondent's *ex parte* actions of granting credit for jail time served in excess of time actually served or earned were contrary to law, i.e., TEX.CODE CRIM.PROC. ANN. art. 42.03(2)(a), and constituted willful violations of Canon 3A(1). In that regard, with the above noted exception of the Commission's finding as to Louis Rangel Sendejas, Jr., we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that the *ex parte* actions of Respondent in granting credit for jail time served in excess of time actually served constituted willful violations of Canon 3A(1).[21] Respondent's Point of Error No. Twenty-two is overruled.

■ In Point of Error No. Twenty-three, Respondent asserts that the Commission erred in finding and concluding that his *ex parte* actions of granting credit for time served in excess of time actually served, without giving the District Attorney's office an opportunity to be heard, were willful violations of Canon 3A(4). This finding and conclusion arises from Respondent's handling of the Sanchez case, Cause No. 105546, the Shaw case, Cause No. 116604, and the Flisowski case, Cause No. 110854, as specifically

---

**21.** Although we hold the evidence to be factually insufficient to support the finding as to Sendejas, we further hold such lack of evidence and its resulting error in that portion of the finding to be harmless in that it did not cause, nor could it

have been reasonably calculated to have caused, the rendition of an improper recommendation, given the facts of the instant case. TEX.R.APP.P. 81(b)(1).

discussed in Point of Error No. Twenty-two above.

The record in the Sanchez case shows that she was sentenced by Respondent on September 25, 1989. The record further shows a handwritten entry in the docket sheet, dated November 17, 1989, indicating that she was given credit for 15 days' served. Also in the record is an order stating as follows:

Upon this the 17th day of November, 1989 came on to be heard the above entitled and numbered cause, whereupon the defendant in this cause is given credit for 15 days served in jail.

The record in the instant case reveals the absence of any motion requesting that Sanchez be granted 15 days' credit. Also absent is an order setting the matter for hearing on that date. Sanchez testified at the hearing before the Special Master that no hearing was conducted on that date, nor did she remember ever requesting Respondent to grant her 15 days' credit for time served.

The record in the Shaw case shows that he was sentenced by Respondent on March 4, 1991. A handwritten entry on the court's docket sheet, dated March 6, 1991, states that Shaw was given credit for 12 days' served. Also in the record is an order substantially similar to the order described above in the Sanchez case. The order is dated March 6, 1991 and awards Shaw credit for 12 days' served. The record is likewise devoid of any motion for such action or any order setting the matter for hearing.

The record in the Flisowski case shows that he was sentenced by Respondent on July 6, 1990. The docket entry of July 6, 1990 indicates that he was given credit by Respondent at the time of sentencing for 1 day served. The record also contains an order substantially similar to the orders described above, dated November 14, 1990. This order credits Flisowski with 10 days' served. As in each of the cases discussed above, the record in the Flisowski case is wholly devoid of any motion to amend the original grant of 1 day credit or order setting the matter for hearing.

It is unmistakable that in each of the above three cases, the granting of jail credit was pronounced at a date subsequent to the original date of sentencing. The records in each of the three cases also include "informal" unsigned orders granting the time served; such orders recite that the matters "came on to be heard." Despite these recitals, nothing in the record indicates that the matters were ever set for hearing or that the District Attorney's office was ever afforded notice of any such hearings or otherwise granted the opportunity to be heard. As noted earlier in response to Respondent's Point of Error No. Six, the citizens of Texas, and especially the parties having an interest in the proceedings, are entitled to see and hear what goes on in the courts of our state. The sentencing of a criminal defendant, in particular the truthfulness in such sentencing, is unquestionably an aspect of criminal proceedings to which the District Attorney, as the duly elected representative of the citizens, is entitled to notice and an opportunity to be present and heard if desired.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that sufficient competent evidence of probative force supports the Commission's finding and conclusion that the *ex parte* actions in granting credit for time served in excess of time actually served, without giving the District Attorney's office notice or an opportunity to be heard, constituted willful violations of Canon 3A(4). Accordingly, Respondent's Point of Error No. Twenty-three is overruled.

■ In Point of Error No. Twenty-four, Respondent asserts that the Commission erred in finding and concluding that his *ex parte* action in granting credit for jail time served in excess of time actually served in Cause No. 120912 was a willful violation of Article V, § 1–a(6)A of the Texas Constitution.

The record shows that Joe Anthony Romero was arrested for the offense of solicitation of prostitution at 6:10 p.m. on June 21, 1991 and was booked into jail at 9:45 p.m. that day. He was released an hour later at 10:45 p.m., earning credit of 1 day. The record further shows that on November 12, 1991,

Respondent deferred Romero's adjudication of guilt and placed him on probation for a period of 6 months. In the deferred adjudication order, Respondent gave Romero credit for 12 days' served.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. For the reasons stated in our discussion of Respondent's Point of Error No. Twenty-two, we hold that Respondent's *ex parte* actions of granting credit for jail time served in excess of time actually served or earned were contrary to law, and constituted willful violations of Canon 3A(1). In that regard, we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that the *ex parte* actions of Respondent in granting credit for jail time served in excess of time actually served constituted willful violation Article V, § 1–a(6)A of the Texas Constitution. Respondent's Point of Error No. Twenty-four is overruled.

In Point of Error No. Twenty-five, Respondent asserts that the Commission erred in finding and concluding that his *ex parte* action of granting Mathews a restricted driver's license was a willful violation of Canons 2 and 3A(4). The docket sheet that relates to Mathews' conviction for driving while intoxicated, Cause No. 120568, shows that after Mathews was placed on probation on August 28, 1991, Respondent granted him a Texas Restricted Occupational License on November 12, 1991.

Mathews testified that in October 1991, his driver's license was suspended for one year as a result of numerous convictions for driving while intoxicated. He further testified that he spoke with Respondent on November 12, 1991 about losing his driver's license and that no member of the District Attorney's office was present during their conversation.

The record contains the completed Application for a Restricted Texas Operators License that Mathews obtained directly from Respondent on November 12 and filed that same day. At the end of the application is a handwritten notation, signed by Respondent, stating "set 11/30/91." The record also contains, however, the Order Granting Defendant a Restricted Texas Operators License, also dated November 12, 1991 and signed by Respondent. This order reads as follows:

[On November 12, 1991], came on to be heard Defendant's Application for a Restricted Texas Operators License, Defendant, [Hollis Mathews], appeared in person and by his attorney or record herein, and the State of Texas appeared by and through her Criminal District Attorney of Galveston County, Texas....

Mathews testified that no member of the District Attorney's office was present at the time his restricted driver's license was granted.

The record also includes the testimony before the Special Master of Kurt Sistrunk, earlier identified as the chief of misdemeanors in the Galveston County District Attorney's Office from October 1991 through January 1992, a time period that includes November 12, 1991. Sistrunk testified that he was familiar with the procedure for applications for restricted Texas operator's licenses. He further testified that those matters were set for hearings; that they had a date each month on which the applications would be heard. At these hearings regularly scheduled before Respondent, a representative of the District Attorney's office, the movant, and the movant's attorney would routinely appear. Sistrunk finally testified that to his knowledge, these applications were not granted without a hearing.

We have examined all the evidence to determine whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that Respondent, in unilaterally entering an order granting Hollis Mathews a restricted driver's license, effectively made a factual determination without the benefit of a hearing on the issue. The testimony supports the allegation that Respondent failed to avoid impropriety and the appearance of impropriety, thereby diminishing public confidence in the integrity and impartiality of the judiciary. The testimony further supports the allegation that Respondent failed to afford the District Attorney's office, a party legally interested in the proceeding, the full

right to be heard according to law. In that regard, we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that Respondent's *ex parte* action of granting Mathews a restricted Texas operator's license was a willful violation of Canons 2 and 3A(4). Accordingly, Respondent's Point of Error No. Twenty-five is overruled.

■■■ We have examined all the above evidence in order to determine whether the Commission's finding in Point of Error No. Five, i.e., that Respondent's conduct was "willful" as that term is applied in Article V, § 1–a(6)A, is so against the great weight and preponderance of the evidence as to be manifestly unjust. Given all the facts and circumstances noted above, we find sufficient competent evidence of probative force to support the Commission's finding that Respondent's conduct was willful. The evidence supports the Commission's cumulative findings and conclusions that Respondent improperly and wrongfully used the power of his office by acting intentionally and with gross indifference to his conduct. The evidence shows more than persistent errors of judgment and suggests corruption, misuse of office, and bad faith generally. Accordingly, Respondent's Point of Error No. Five is overruled.

### 5. Alleged Denial of Procedural Due Process

In Point of Error No. Three, Respondent asserts that the procedures and actions taken by the Special Master and the Commission constitute a denial of the due process guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article 1, Section 19 of the Texas Constitution. Specifically, Respondent contends that the Examiner engaged in trial by ambush, thereby depriving Respondent of a fair opportunity to be heard and to present evidence in his defense.

Of initial importance in this determination is the chronology of events that form the basis of Respondent's claims. We have noted that an informal hearing was conducted before the Commission on November 6, 1992, at which Respondent appeared and testified. Respondent argues that although the Examiner was fully aware at that time of the thirty additional allegations leveled against him during the later stages of these proceedings, the Examiner did not include these allegations in the original notice of formal proceedings. Thus, Respondent claims that he had no idea how these matters would be pleaded and, presumably, had insufficient time to prepare a defense against these allegations once they were added to the notice of formal proceedings. We disagree with Respondent's contention.

■■■ The hearing on November 6, 1992 constituted a proceeding during the "informal" stages of the instant case. *See* RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, Rule 6. As a result of this informal hearing, the Commission ordered that formal proceedings be instituted. *Id.*, Rule 10. These formal proceedings commenced when the Notice of Formal Proceedings was served on Respondent on December 16, 1992. These formal proceedings, which include the hearing before the Special Master, are wholly separate and independent from the informal investigation and preliminary disposition by the Commission. Nothing in the Rules for the Removal or Retirement of Judges serves to indicate that the charges and factual bases thereof leveled against the judge are limited to those brought before the Commission during the informal stage of the proceedings.[22] Given the fact that civil rules of procedure and evidence apply, we hold that the Rules do not prohibit subsequent, but timely, supplementation or amendment of pertinent pleadings.

---

22. RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, Rule 10(a)(2) provides in pertinent part:

The notice shall specify in ordinary and concise language the charges against the judge, and the alleged facts upon which such charges are based and the specific standards contended to have been violated, and shall advise the judge of his right to file a written answer to the charges against him within 15 days after service of the notice upon him.

This Rule makes no mention of the prior "informal" proceedings before the Commission or the facts upon which the Commission decided to institute "formal" proceedings.

■ The record indicates that after Judge Thoma's response to the Notice of Formal Proceedings and the appointment of a Special Master to preside over the formal proceedings, both parties conducted extensive discovery. Thereafter, on March 25, 1993, the Examiner served Respondent with a First Amended Notice of Formal Proceedings, which included the approximately thirty additional allegations of which Respondent now complains. Respondent timely filed his First Amended Response to First Amended Notice of Formal Proceedings.

The formal hearing before the Special Master was held on June 1–4, 1993, more than two months after Respondent was served with the First Amended Notice of Formal Proceedings. Even if the Examiner was aware of the additional allegations as early as November 6, 1992, we fail to see how waiting until March 25, 1993 to include the allegations in the Notice of Formal Proceedings in any way violated Respondent's due process rights. In his brief, Respondent himself states that the Examiner described these allegations to him in considerable detail on November 6, 1992. Respondent was thus aware that the Examiner and/or the Commission was possibly investigating these allegations as well as those included in the original Notice of Formal Proceedings. Further, the two months between service of the First Amended Notice of Formal Proceedings on Respondent and the date of the hearing before the Special Master provided sufficient time to prepare a defense against the additional allegations. Consequently, we find that Respondent's rights to due process were not violated by the timing of the First Amended Notice of Formal Proceedings.

■ Respondent further contends that the actions of the Special Master and the Commission in not allowing medical evidence of any condition other than Auditory Dyslexia effectively prevented him from present-ing any defense to the allegations against him based on other medical conditions. Respondent asserts that during the hearing before the Special Master, on June 2, 1993, the attorneys for Respondent learned that both of Respondent's children were dyslexic. The attorneys then immediately instructed Respondent to get an evaluation, and he was diagnosed as having Auditory Dyslexia.

The record shows that Respondent filed a Second Amended Response to First Amended Notice of Formal Proceedings on June 3, 1993, still during the formal hearing before the Special Master, requesting that the Special Master conduct an evidentiary hearing on the Auditory Dyslexia issue. The Special Master declined to conduct such a hearing at that time, ruling that it would be an unreasonable burden on the Examiner. After this initial hearing before the Special Master, Respondent filed with the Commission a Motion to Present Additional Evidence Concerning Auditory Dyslexia on June 18, 1993.[23]

On August 13, 1993, the Commission granted the Motion to Present Additional Evidence Concerning Auditory Dyslexia. A supplemental hearing before the Special Master was then set for November 2, 1993. Before the supplemental hearing, on October 14, 1993, Respondent filed his Third Amended Response to First Amended Notice of Formal Proceedings, adding additional medical conditions as a defense to the allegations against him. These conditions included Attention Deficit Disorder, a condition that Respondent now claims was not discovered until after August 13, 1993. The Examiner filed special exceptions to the third amended response on October 19, 1993, and the Special Master granted the special exceptions on October 25, 1993.

The record shows that during the supplemental hearing on November 2–3, 1993, Respondent requested that the Special Master

---

**23.** Rules for the Removal or Retirement of Judges, Rule 10(*l*) provides:

(1) The commission may order a hearing for the taking of additional evidence at any time while the matter is pending before it. The order shall set the time and place of hearing and shall indicate the matters on which the evidence is to be taken. A copy of the order shall be sent to the judge at least 10 days prior to the date of the hearing.

(2) The hearing of additional evidence may be before the commission itself or before the special master, as the commission shall direct; and if before a special master, the proceedings shall be in conformance with the provisions of Rule 10(d) to 10(g) inclusive.

reconsider his order granting the special exceptions, and the Special Master reaffirmed his previous ruling. After the supplemental hearing, Respondent filed his Second Motion to Present Additional Evidence of Impairment and Request to Testify Fully on November 8, 1993. The Commission denied the motion.

Given the procedural aspects of the above motion, we find Respondent's Second Motion to Present Additional Evidence of Impairment and Request to Testify Fully to be the functional equivalent of a motion for new trial based on newly discovered evidence. *See* Tex.R.Civ.P. 324. The decision to grant or deny a motion for new trial based on newly discovered evidence rests largely in the discretion of the trial court, or in the instant case, the Commission. *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983). The party moving for a new trial based on newly discovered evidence must demonstrate to the trial court the existence of several factors:

 (1) that the evidence has come to light since the time of trial or so late in the trial that it was impossible to present the evidence before the trial closed;

 (2) that it was not because of a lack of due diligence that the information did not come sooner;

 (3) the new evidence is not cumulative or impeaching; and

 (4) the evidence is so material that it would probably produce a different result in a new trial.

*Id.* Each of the above elements must be established by an affidavit of the party. On appeal, the refusal to grant a motion for new trial will be reversed for abuse of discretion only when "after searching the record, it is clear that the trial court's decision was arbitrary and unreasonable." *Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex.1987).

Our review of the record reveals that Respondent wholly failed to establish the above elements. The evidence of Attention Deficit Disorder could have been discovered, through the exercise of due diligence, by the time Respondent filed his first Motion to Present Additional Evidence Concerning Auditory Dyslexia and included in that motion. Also, as Respondent points out in his brief, both Auditory Dyslexia and Attention Deficit Disorder are cognitive processing disorders. Respondent has failed to establish that evidence of an Attention Deficit Disorder is not cumulative of the Auditory Dyslexia evidence. Finally, we note that after conducting a supplemental hearing, the Special Master labeled Respondent's Auditory Dyslexia defense as "frivolous" in his Supplementary Findings of Fact. As such, evidence of a similar disorder is not so material that it would probably produce a different result in a new hearing. Consequently, we find no abuse of discretion by the Commission in denying Respondent's Second Motion to Present Additional Evidence of Impairment and Request to Testify Fully. Accordingly, Respondent's Point of Error No. Three is overruled.

### 6. Bills of Exception

In Point of Error No. Four, Respondent asserts that the Special Master erred in denying his requests at the supplemental hearing on November 2, 1993 to make informal bills of exception. Specifically, Respondent asserts that after the Special Master struck Respondent's Third Amended Response to the Commission's petition, Respondent requested, pursuant to Tex.R.App.P. 52(b), an opportunity to make an informal bill of exception containing the evidence that was excluded as a result of Respondent's response being struck. This request was denied by the Special Master. Respondent then tendered the desired "deposition" testimony to the Commission on November 24, 1993; the Commission refused to consider the evidence, but ordered the documents sealed and included in the record in this appeal. As previously noted, the record shows that after the initial hearing before the Special Master on June 1–4, 1993, the Commission granted Respondent's Motion to Present Evidence of Auditory Dyslexia at a supplemental hearing before the Special

Master. *See* Rule 10(*l*)(1).[24] Before this supplemental hearing was held, Respondent filed his Third Amended Response, adding other medical conditions (including Attention Deficit Disorder) to his affirmative defense. The Examiner filed special exceptions to this Third Amended Response, asserting that the Commission's order granting the supplemental hearing limited the scope of the hearing to matters related to Auditory Dyslexia. In response to the special exceptions, the Special Master subsequently granted an order limiting the evidence and argument at the supplemental hearing to the issue of Auditory Dyslexia.

During the supplemental hearing on Auditory Dyslexia on November 2, 1993, Respondent filed a Motion to Reconsider Ruling on Examiner's Special Exceptions to Respondent's Third Amended Response. The issue raised by this motion and the arguments contained therein is clear—whether the Special Master could expand the supplemental hearing to consider evidence beyond the scope of the Commission's order granting the supplemental hearing. The Special Master considered the matter and reaffirmed his previous ruling on the special exceptions. He also denied Respondent's request for a bill of exception.

The record further shows that after the supplemental hearing, Respondent tendered to the Commission the evidence excluded from the supplemental hearing. The Examiner objected to the tendered documents, in the form of statements or "depositions" from doctors, and the Commission refused to con-

sider the documents but ordered the evidence sealed and included in the record for appeal.

Having carefully reviewed the record, we hold that even if it was error for the Special Master to deny Respondent's request to make an informal bill of exception at the supplemental hearing to include the excluded evidence of Attention Deficit Disorder, any such error was harmless. *See* TEX.R.APP.P. 81(b). After the supplemental hearing, Respondent filed his motion to present this additional evidence and tendered the evidence to the Commission. Thus, the Commission had the same opportunity to consider the evidence as it would have if the evidence was included in a bill of exception. Respondent's Point of Error No. Four is overruled.

 Having sustained Respondent's Point of Error No. Nine, but finding any error therein harmless, and having overruled all of Respondent's remaining points of error, we affirm the recommendation of the State Commission on Judicial Conduct and further order that Respondent, John N. Thoma, be removed as Judge of the County Court at Law No. One of Galveston County, Texas, and further, that he be forever barred from holding judicial office.

---

24. RULES FOR THE REMOVAL OR RETIREMENT OF JUDGES, Rule 10(*l*)(1) reads in pertinent part as follows: The commission may order a hearing for the taking of additional evidence at any time while the matter is pending before it. The order shall set the time and place of hearing and **shall indicate the matters on which the evidence is to be taken**.... [Emphasis added].