No. 04-98-00015-CR and 04-98-00022-CR



Edward SALAZAR,


Appellant



v.



The STATE of Texas,


Appellee



From the 81st Judicial District Court of Atascosa County, Texas


Trial Court No. 96-07-00090-CRA and 96-07-0091-CRA


Honorable Olin Strauss, Judge Presiding



Opinion by: Tom Rickhoff, Justice 


Sitting: Tom Rickhoff, Justice 

 Sarah B. Duncan, Justice 

 Karen Angelini, Justice 


Delivered and Filed: January 27, 1999


AFFIRMED 


 Edward Salazar was convicted by a jury for aggravated sexual assault of a child and
indecency with a child. The trial court sentenced him to 25 years on the former conviction and 20
years on the latter. In four points of error Salazar argues that the trial court erred: 1) in permitting
the prosecutor to argue the law of parties to the jury; 2) in not instructing the jury that indecency
with a child was a lesser included offense of aggravated sexual assault of a child; and 3) in his
handling a request from the jury for disputed testimony. Salazar also disputes the legal and factual
sufficiency of the evidence to support his conviction. We affirm.

FACTS


 Because Salazar challenges the sufficiency of the evidence to support his conviction, a
detailed review of the evidence before the jury is in order.

 Officer Rudy Ortiz was the Pleasanton police officer who first responded to the complaint.
He said he arrived at the complainant's house just after 5 a.m. on June 30, 1996, where he found the
complainant, K. A. F., "very distraught, crying, grabbing her stomach area, rolling back and forth.
She was laying in a crouch . .. in a half-sitting, half-laying position." He said she told him that
"approximately eight people had 'done' her" and blurted out some names, the first of which was
"Edward." Ortiz said he followed the ambulance which took the complainant to the hospital and said
she gave him more complete names while they were waiting in the emergency room. Ortiz said K.
A. F. first told him "Edward Tijerina" was one of her assailants; she later corrected herself and said
his last name was Salazar.

 Ortiz said he took all of her clothing and sealed it in evidence bags, and that the ambulance
transported her to the hospital on a separate clean sheet so that any evidence that might fall from her
clothing would be caught as evidence.

 When he was finished at the hospital, Ortiz said he and two other officers went over to
Salazar's residence, where the assault allegedly occurred. They obtained consent from Salazar to
search his room and "basically went over the room with a fine-toothed comb." The officers collected
a bedspread, debris from a waste basket, a mattress, and a piece of a condom wrapper.

 K.A.F. testified she was twelve at the time of the incident. She said she went to a party at
the Lions' Club in Pleasanton on June 29 with Joe Allen Rodriguez and his girlfriend Veronica
Bazan. She said they stayed late at the party; then Maria "Tomato" Tijerina, a friend of Veronica's
(and Salazar's half-sister), arrived and shared a bottle of Boone's Farm wine with her. K.A.F. said
that when the party at the Lions' Club was over, she went with Tijerina, Lucas Rodriguez and Bazan
to Joe Allen Rodriguez's house. Once there, she was first approached by her cousin, Lucas
Rodriguez, who asked if she wanted to "get hooked up with a friend;" when she said no, she said
Tijerina kicked and slapped her and then told her that several of the boys at the party wanted to have
sex with her. K.A.F. said she said no; she said Tijerina then took her by the head and dragged her
outside. She said Tijerina made her call her mother to ask permission to stay over at the party; then,
she said, a group of them went over to the house Tijerina shared with her mother and her half-brother, Edward Salazar.

 K.A.F. said Tijerina took her to her brother's room and told her to "give the guys what they
want." She said Gary Gilbert first forced himself on her; then Lucas Rodriguez sodomized her. She
said Lucas asked, "Who's next?" and then Brian Rangel forced himself on her. She said Edward
Salazar and Felipe Romero were rubbing their fingers on her breasts while Rangel had sex with her
and penetrated her vagina with their fingers after Rangel was done. After promising not to tell
anyone, K.A.F. convinced them to let her go.

 On cross-examination K.A.F. said that although the lights were off while she was being
assaulted, she could tell who her attackers were by the light from a street light coming through the
window.

 Lucy Ann Yanez was a social worker who interviewed K.A.F. when she arrived at the
Jourdanton hospital. She said K. A. F. told her she was raped, and said the girl had been crying and
was traumatized by the incident.

 Burnett Hanson was the emergency room doctor who examined K.A.F. He said she told him
that seven males had beat her and forced her to have anal, vaginal and oral sex. He said K.A.F. was
emotionally unstable and kept saying that they had taken something from her. Hanson said there
were 13 to 14 fresh marks on K.A.F. and that her condition was consistent with the history she gave
him.

 Lucas Rodriguez testified he was at the party at the Lions Club for Joe Allen Rodriguez's
graduation. He said that after that party came to an end, he went over to Rodriguez's house. He said
K. A. F. was there, was drinking, and offered to perform oral sex on his friends. He said a group,
including Tijerina, K. A. F., Bacilio, Gary Delgado and Richard Gilliman, went over to Tijerina's
and Edward Salazar's house. He said the group went into Salazar's room, where Rangel, Salazar
and Matthew Rodriguez were sleeping on two mattresses on the floor. He said K. A. F. went into
the bedroom with Edward, Felipe, Bacilio, Gary Gilbert and Gary Delgado; at that point Bacilio and
Felipe walked out. Rodriguez said K. A. F. lay next to Gary Gilbert on a mattress and that they had
sex; then Rangel got on top of her and had sex, after putting on a condom; then Lucas said he had
sex with her. He also said Edward Salazar and Felipe didn't have sex with her.

 Rodriguez testified that K. A. F. was a willing participant in the night's activities. He said
she offered to perform oral sex on his friends; although he said he didn't know if she actually
followed through, he said she boasted that she had. Rodriguez said she jumped at the chance to go
over to Edward Salazar's house; and that she made no protest in Salazar's room. (Rodriguez also
said that his testimony was part of a plea agreement with prosecutors.)

 Bacilio Tijerina testified that he drove a group, including Maria Tijerina, K. A. F., Gary
Delgado and Gary Gilbert, from the Rodriguez residence to Edward Salazar's house. He said he
spent about forty-five minutes in the kitchen of the house, talking to Tijerina; then he went into
Salazar's bedroom and turned on the light. He said he saw K. A. F. lying on the mattress next to
Gary Gilbert with her shorts down around her knees; then those in the room yelled at him to turn out
the light. At that point, Bacilio said, he decided to leave, and Manuel Casias and Gary Delgado went
with him.

 John Eric Rutherford, a Pleasanton police officer, testified as to the collection of evidence.
 He said he took a statement from K. A. F. about two weeks after the incident; he said he waited that
long because of the traumatic nature of the incident. He said he had taken many statements from
rape victims, that he had training recognizing rape trauma syndrome, and that K. A. F. was
exhibiting those symptoms.

 Larry Bosquez testified he picked up K. A. F. early on the morning of June 30. He said she
came running out of a group of people outside Salazar's house as he was driving by and asked them
for a ride. He said she was in a hurry, that she was crying and that she said she had been raped.

 Shirley Ann Walsh Menard is a certified nurse practitioner and faculty member at the UT
Health Science Center in San Antonio who specializes in examining sexually abused children. She
testified that children who have been raped often exhibit symptoms of what has been categorized as
post-traumatic stress disorder.

 Jose Manuel Hernandez, a child and adolescent psychiatrist, testified on post-traumatic stress
disorder. He said he had reviewed K. A. F.'s records and expressed the opinion that she was
suffering from this disorder.

 Katherine Caballero testified on DNA analysis of evidence collected in Edward Salazar's
room and from K. A. F. as she was examined after the rape. She said her testing from a hair found
on the victim's sock matched Felipe Romero's DNA type, a type he would share with about 3.5
persons out of one hundred. She testified she found no semen among the samples submitted in the
rape kit; she also said that semen was absent in about 70 percent of the rape cases she analyzed.

 Huy Nguyen, an analyst with the Department of Public Safety's crime laboratory in Corpus
Christi, testified on the results of his hair sample comparisons. He said he examined several hairs
collected from either the victim's clothing or her body; one hair, recovered from K. A. F.'s sock,
matched characteristics of Felipe Romero's pubic hair, while another matched characteristics of
Rangel's head hair. Other hairs, Nguyen testified, were consistent with a head hair from Felipe
Romero and a pubic hair from Edward Salazar. Nguyen also said hair sample comparison was used
as a screening tool by investigators because it is not precise enough to state definitively whether a
given hair came from a given person.

 Gary Gilbert testified he was at the Lions Club party and went over to Joe Allen Rodriguez's
house after that party finished. He said he talked to K. A. F. for about five minutes at that party, and
when the later party shut down too, he went with another group, including K.A.F., over to Edward
Salazar's house.

 Gilbert said he was sitting on the same mattress on the floor with K. A. F., Salazar and Lucas
Rodriguez when she started taking off her pants. He said at that point Rangel kicked him in the leg;
he got up and went with Felipe Romero into another room. He said K. A. F. came out of the room
a few minutes later, flustered and upset. He denied having any sexual relationship with her.

 Edward Salazar testified he was at the Lions Club party from about 11 p.m. to about 12:15,
then at Joe Allen Rodriguez's house from then to about 2:30; then he said he left to work a
newspaper route with his father. He said he got finished with that an hour to an hour and a half later;
he got home and found Rangel and Romero asleep in his room, on two mattresses he had out on the
floor. He said he went to sleep and was awakened by Rangel and Romero fighting in the hallway
outside his room; he said he made them go outside.

 Salazar said that after he pushed Rangel and Romero outside his mother's house, he saw K.
A. F., who asked him to get her out of the house because his half-sister, Maria, was hitting her. He
said he walked her out to the street, where Larry Bosquez picked her up.

 Salazar testified he never saw K. A. F. inside his room that night, and denied having sex with
her. He also testified his window was covered with aluminum foil, and there was no street light
outside his window.

 Brian Rangel testified he began drinking with Lucas Rodriguez and his father about 5 p.m.
on June 29 and that he, Lucas and another girl went to the Lions Club party about 9 p.m. He said
he went to Joe Allen Rodriguez's house about midnight for the after-party party. He said that at that
point he was so intoxicated he was unable to eat without dropping food out of his mouth. He said
he sat down in Salazar's car and passed out shortly thereafter.

 Rangel said he woke up when Romero kicked him in Salazar's room and that he started
fighting with Romero in the hallway outside the room. He said Salazar broke up the fight and said
he may have seen K. A. F. walk by as she left. He denied having any kind of a sexual relationship
with the victim.

 Felipe Romero testified that he went to the Lions Club party about 10 p.m. He said he saw
K. A. F. there with Maria Tijerina, Lucas Rodriguez, Manuel Casias, and Gary Delgado by a pickup
truck. He said he left there about 3 a.m. with Jaime Garza and Gary Gilbert to go to Edward
Salazar's house. When he got there he said he saw K. A. F., Maria Tijerina, Rodriguez, Bacilio
Tijerina, Gary Delgado and Manuel Casias in the kitchen. He said that the crowd moved into
Edward's room; when he got in there, he said he kicked Brian, who was sleeping, and the two got
into a fight in the hallway. Romero said he then went into the kitchen, where he stayed for about 20
minutes, at which point Rangel came out of Edward's room and the two scuffled again. Romero said
he then went home.

 Romero said he saw K. A. F. and Tijerina in the kitchen whispering intently and that K. A.
F. left before he did. He said he never touched K. A. F.

 Janie Fernandez testified she was K. A. F.'s mother, and that she went to pick up her
daughter at the Lions Club pavilion about midnight and she wasn't there. She said K. A. F. called
and hung up and called and was "playing around on the phone" later that night. She said she didn't
know where her daughter was until she called about 3 a.m. and asked to stay at Maria Tijerina's
house. She said K. A. F. got home about 4 a.m. and told her that Maria Tijerina had pulled a knife
on her and that she had been raped.

double jeopardy


 In his second issue Salazar argues the trial court erred in failing to instruct the jury that
indecency with a child was a lesser-included offense of the crime of aggravated sexual assault of a
child. Because of the case law cited by Salazar in support of this issue, we will treat this as a double
jeopardy complaint.

 The Fifth Amendment guarantee against double jeopardy embodies three protections: against
a second prosecution for the same offense following conviction, against a second prosecution for the
same offense following acquittal, and against multiple punishments for the same offense. Illinois
v. Vitale, 447 U.S. 410, 415; Cervantes v. State, 815 S.W.2d 569, 572 (Tex. Crim. App.1991).
Salazar seeks to invoke the third of these protections, since greater-inclusive and lesser-included
offenses are the same for jeopardy purposes. Parrish v. State, 869 S.W.2d 352, 354 (Tex. Crim.
App. 1994) (citing Brown v. Ohio, 432 U.S. 161, 169 (1977)). But before we reach the merits of
Salazar's jeopardy claim, we must deal with the state's assertion that Salazar waived the point
because he did not object in the court below.

 1. Waiver of Jeopardy Claim

 Ordinarily, this failure to present a double jeopardy complaint would mean no error is
preserved for appellate review. See, e.g., Ex parte Murphy, 669 S.W.2d 320, 322 (Tex. Crim. App.
1983), cert. denied, 469 U.S. 823 (1984); Nash v. State, 467 S.W.2d 414, 416 (Tex. Crim. App.
1971). This is a general rule which balances a defendant's right to assert his federal constitutional
protection against double jeopardy against the state's right to assert its legitimate interest in an
orderly trial process. Shaffer v. State, 477 S.W.2d 873, 875 (Tex. Crim. App. 1971). In cases where
the trial court either knew or should have known of the jeopardy problem, however, no purpose is
served in enforcing the state procedural rule and the defendant may assert this interest after trial. Id.
at 876; see also State v. Torres, 805 S.W.2d 418, 422 (Tex. Crim. App. 1991) ("[W]here a plea of
jeopardy is before the same court and judge, as in the case at bar, statutory requirements concerning
the plea are relaxed.")(citing Ex parte Jewel, 535 S.W.2d at 365); Casey v. State, 828 S.W.2d 214,
216 fn. 1 (Tex. App.--Amarillo 1992, no writ).

 Here the complained-of jeopardy problem consists of two convictions arising out of the same
criminal transaction, before the same judge and jury. Because the trial court either knew or should
have known of this possible complication, we find that Salazar may assert his claim to protection
from double jeopardy in this proceeding.

 2. The Merits of the Jeopardy Claim

 Salazar rests his protection from double jeopardy on this court's holding in Ochoa v. State,
955 S.W.2d 389 (Tex. App.--San Antonio 1997), aff'd, No. 1571-97, 1998 WL 870692 (Tex. Crim.
App. December 16, 1998). As here, Ochoa involved indictments for both aggravated sexual assault
of a child and indecency with a child; as here, the jury convicted on both counts and punishment was
assessed on both counts. Ochoa, 955 S.W.2d at 390-391. This court, using the test fashioned in
Cunningham v. State, 726 S.W.2d 151 (Tex. Crim. App. 1987), found that under the facts of that
case the indecency of a child count was a lesser-included offense of aggravated sexual assault of a
child count. Ochoa, 955 S.W.2d at 392. We went on to find that the trial court's failure to instruct
the jury that the one was a lesser-included offense of the other violated the defendant's protection
against double jeopardy. Id. at 393.

 In affirming this court's holding in Ochoa, the court of criminal appeals stressed that
reviewing courts should "focus[] on whether the evidence in this case justified the trial court in
submitting instructions that would permit the jury to convict and sentence appellant" for both
offenses. Ochoa, 1998 WL 870692 at *4. That court concluded that "[b]ecause there was evidence
of only one offense committed by appellant . . . the state should have elected which offense upon
which it would proceed or, in the alternative, received a submission of the offense of indecency with
a child to the jury only as a lesser-included alternative to the offense of aggravated sexual assault." 
Id. at *5.

 We therefore turn to a review of the evidence to see whether the evidence supports the trial
court's submission of both offenses. We find that it does. The testimony from K.A.F. was that
Salazar was rubbing his fingers on her breasts while Rangel had sex with her; when Rangel was
done, she added, Salazar rubbed his fingers inside her vagina. This testimony shows two separate
criminal acts which support the submission of two different jury questions. Under the evidence in
this case, we find that indecency with a child was not a lesser-included offense of aggravated sexual
assault of a child. Salazar's third issue is overruled.

Legal and Factual Sufficiency of the Evidence


 In his fourth issue Salazar complains that the jury lacked sufficient evidence to support a
verdict of guilty beyond a reasonable doubt. We will interpret this as a complaint that the evidence
was either legally or factually sufficient to support the jury's verdict.

 1. Legal Sufficiency of the Evidence

 Legal sufficiency is the constitutional minimum required by the Due Process Clause of the
Fourteenth Amendment to sustain a criminal conviction. See Jackson v. Virginia, 443 U.S. 307,
315-16 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational trier
of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson,
443 U.S. at 320, 99 S.Ct. at 2789; Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993),
cert. denied, 511 U.S. 1046 (1994). The evidence is examined in the light most favorable to the
jury's verdict. Jackson, 443 U.S. at 320; Johnson, 871 S.W.2d at 186. The standard is the same in
both direct and circumstantial evidence cases. Geesa v. State, 820 S.W.2d 154, 162 (Tex. Crim.
App. 1991). All of the evidence is considered by the reviewing court, regardless of whether it was
properly admitted. Johnson, 871 S.W.2d at 186; Chambers v. State, 805 S.W.2d 459, 460 (Tex. Crim
App. 1991); Thomas v. State, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988). A successful legal
sufficiency challenge will result in rendition of an acquittal by the reviewing court. Tibbs v. Florida,
457 U.S. 31, 41- 42 (1982).

 The sufficiency of the evidence is measured against the offense defined by a hypothetically
correct jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge
would include one that "accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State's burden of proof or unnecessarily restricts the State's theories of
liability, and adequately describes the particular offense for which the defendant is tried." Id.

 The jury is the trier of fact, and is the ultimate authority on the credibility of witnesses and
the weight to be given to their testimony. See Tex. Code Crim. Proc. Ann. Art. 38.04 (Vernon
1979); Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App. [panel op.] 1981). It is for the
jury as trier of fact to resolve any conflicts and inconsistencies in the evidence. Bowden v. State, 628
S.W.2d 782, 784 (Tex. Crim. App. 1982). Even where there is no conflict, the jury may give no
weight to some evidence, and thereby reject part or all of a witness's testimony. See Beardsley v.
State, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987); see also Chambers, 805 S.W.2d at 461 (holding
jury as judge of credibility may "believe all, some, or none of the testimony"). Because it is the
province of the jury to determine the facts, any inconsistencies in the testimony should be resolved
in favor of the jury's verdict in a legal sufficiency review. Johnson v. State, 815 S.W.2d 707, 712
(Tex. Crim. App. 1991) (quoting Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim App. 1988)).

 We find the evidence legally sufficient to support the jury's guilty verdicts. K. A. F. said
Salazar was fondling her breast while Rangel forced her to have sex with him, and that Salazar
penetrated her vagina with his finger after Rangel had finished. Moreover, one of the hairs found
on K. A. F.'s sock after she disrobed for her rape examination matched characteristics of Salazar's
pubic hair. While some witnesses told conflicting stories, it is the province of the jury to resolve
those conflicts. See, e.g., Chambers, 805 S.W.2d at 461 (where 12-year-old complainant recanted
her videotaped testimony from the stand, jury was entitled to disbelieve her recantation). Here the
jury evidently resolved the conflicts in testimony against Salazar. We therefore find the evidence was
legally sufficient to sustain Salazar's conviction.

 2. Factual Sufficiency

 We now turn to whether the evidence was factually sufficient to sustain Salazar's conviction.
See Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996). The factual sufficiency review process
begins with the assumption that the evidence is legally sufficient under the Jackson standard. 
Clewis, 922 S.W.2d at 134 (citing Stone v. State, 823 S.W.2d 375 (Tex. App.--Austin 1992, pet.
ref'd, untimely filed). The appellate court then considers all of the evidence in the record related to
appellant's sufficiency challenge, not just the evidence which supports the verdict. Id. The appellate
court reviews the evidence weighed by the jury which tends to prove the existence of the fact in
dispute, and compares it to the evidence which tends to disprove that fact. Santellan v. State, 939
S.W.2d 155, 164 (citing Ellis County State Bank v. Keever, 915 S.W.2d 478, 479 (Tex. 1995) and
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994)). The court is authorized to
disagree with the jury's determination, even if probative evidence exists which supports the verdict.
Clewis, 922 S.W.2d at 133; see also In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

 However, factual sufficiency review must be appropriately deferential so as to avoid the
appellate court's substituting its own judgment for that of the fact finder. Clewis, 922 S.W.2d at
133. The court's evaluation should not substantially intrude upon the jury's role as the sole judge
of the weight and credibility of witness testimony. Santellan, 939 S.W.2d at 164 (citing Pool v.
Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986); Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d
792, 796 (1951); and In Re Thoma, 873 S.W.2d 477, 485 (Tex. Rev. Trib. 1994)). We reverse only
when the verdict is against the great weight of the evidence presented at trial so as to be clearly
wrong and unjust, i.e., when the jury's finding is "manifestly unjust," "shocks the conscience," or
"clearly demonstrates bias." Clewis, 922 S.W.2d at 135 (citing Meraz v. State, 785 S.W.2d 146, 149
(Tex. Crim. App. 1990)). This standard grants the appropriate deference to the jury's verdict and
prevents the reviewing court from substituting its judgment for that of the jury. Santellan, 939
S.W.2d at 164.

 We find that the jury's verdict has ample support in the evidence. Salazar's fourth issue is
overruled.

The Law of Parties


 In his first issue Salazar complains that he was prejudiced because the prosecutor talked
about the law of parties in his opening argument. (The jury was not charged on the law of parties.)
However, Salazar's lawyer did not object; therefore any error is waived. See Cockrell v. State, 933
S.W.2d 73, 89 (Tex. Crim. App. 1996), cert. denied, 117 S.Ct. 1442 (1997). Salazar's second issue
is overruled.


Reading Back Testimony


 In his third issue Salazar contends the trial court reversibly erred by not informing the jury,
when they requested testimony be supplied to them in the jury room, that they could not have such
testimony unless there was a dispute among the jurors as to what that testimony was. See Tex. Code
Crim. Proc. Ann. art. 36.28 (Vernon 1981).

 It is proper for a trial court, in response to a jury's request for testimony on a particular issue,
to advise them that it cannot comply with their request unless the jurors state that they are in
disagreement about a witness's statement or a particular point of testimony, and that only this
testimony and no other can be read to them. Jones v. State, 706 S.W.2d 664, 667 (Tex. Crim. App.
1986). The question becomes whether it is error for the trial court to not offer this explanation.

 The court of criminal appeals has held that it is not error when a trial judge, refusing a jury's
request for testimony because the request does not show disagreement, does not advise the jury that
the testimony would be provided if they had a disagreement about a particular part. Vasquez v.
State, 415 S.W.2d 188, 191 (Tex. Crim. App. 1967). Moreover, the Jones court made clear that the
trial court must first determine if the request for testimony is a proper one under article 36.28. Jones,
706 S.W.2d at 667 (quoting Iness v. State, 606 S.W.2d 306 (Tex. Crim. App. 1980)). Article 36.28
provides that if jurors "disagree as to the statement of any witness" the trial court may have read to
them "that part of such witness testimony or the particular point in dispute, and no other . . .." We
therefore find that the trial court did not err.

Conclusion 


 The judgments of the trial court are in all things affirmed.

 Tom Rickhoff, Justice

 Do Not Publish


Return to
4th Court of Appeals Opinions